584-07/PJG/LJK

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Defendant
Cosmotrade Exports S.A.
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax

Peter J. Gutowski (PG 2200)
Lawrence J. Kahn (LK 5215)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------x

DOUBLE HAPPINESS SHIPPING
COMPANY LIMITED,

                          Plaintiff,

    -against-

COSMOTRADE EXPORTS S.A.,

                       Defendant.
-----------------------------------------------------x

**07 CV 4615 (LTS)**

**GUTOWSKI AFFIRMATION
IN SUPPORT OF MOTION FOR
<u>COUNTER-SECURITY</u>**

      PETER J. GUTOWSKI, an attorney at law, affirms under penalty of perjury as follows:

      1.      I am an attorney admitted to practice before this Court and am a partner of the law firm of Freehill Hogan & Mahar, LLP, attorneys for Defendant COSMOTRADE EXPORTS S.A. ("COSMOTRADE"). I am not a party to the action, am over 18 years of age, and have an address at 80 Pine Street, New York, New York. I submit this Affirmation on behalf of COSMOTRADE in support of its application for an Order directing Plaintiff DOUBLE HAPPINESS SHIPPING COMPANY LIMITED ("DOUBLE HAPPINESS") to provide counter-security in full for COSMOTRADE's counterclaims.

NYDOCS1/297435.1

2.    The following background facts are not in dispute.

3.    Plaintiff DOUBLE HAPPINESS and Defendant COSMOTRADE entered into a maritime contract of charter party dated April 12, 2007 for the M/V ALEXIA M. Disputes arose between the parties relating to the performance of that contract, which claims are being arbitrated in London, England, pursuant to the arbitration agreement between the parties.

4.    DOUBLE HAPPINESS filed the subject action primarily for the purpose of obtaining security in connection with the claims it lodged in the London arbitration. An order of attachment was issued pursuant to Rule B, which was subsequently served on various garnishee banks.  Funds have been restrained which, combined with other security provided by COSMOTRADE in the form of an escrow deposit, have resulted in Plaintiff DOUBLE HAPPINESS obtaining full security for its claims plus further security for a potential recovery of interest, costs, and arbitrators fees.

5.    For its part, Defendant COSMOTRADE has a counterclaim against DOUBLE HAPPINESS arising out of the same contract, which is similarly being asserted in the same London arbitration proceeding between the parties.  In the London proceedings, the parties have already exchanged their main points of claim and points of reply, so the nature of Defendant COSMOTRADE's counterclaim is fully known to Plaintiff DOUBLE HAPPINESS.  Copies of the exchanged points of claim are attached hereto as Exhibits A and B, respectively.

6.    COSMOTRADE's counterclaim involves claims in damages, alternatively off-hires, due to misdescription and/or deficiency of the vessel's cranes, additional cost of bunkers, offhire and bunkers consumed during unauthorized deviation by the vessel, and

claims for damages, alternatively off-hire for stoppages during the voyage, and other matters. COSMOTRADE's counterclaim, in the amount of $553,748.30,[1] is larger in terms of quantum than DOUBLE HAPPINESS's. Based upon the foregoing, and with an allowance for recovery of interest, costs and anticipated arbitrators' fees (which were all previously granted by the Court in favor of DOUBLE HAPPINESS in connection with its Rule B application), COSMOTRADE's total counterclaim for which it seeks counter-security is $433,062.10, calculated as follows:

| Amount | Description |
|---|---|
| $252,463.30 | Principal Claim of $553,748.30 less amount already in escrow of $301,285 |
| $60,598.80 | Interest on the principal claim (less the escrow, which is earning interest), calculated at 8% (the commercial rate anticipated to be awarded) over a period of three years (the time generally required to complete London arbitral proceedings and obtain entry of judgment thereon)[2] |
| $40,000.00 | Anticipated arbitrators' fees, the same figure used by DOUBLE HAPPINESS in its application |
| $80,000.00 | Anticipated recoverable costs of the arbitration under English law, which allows for recovery of reasonable attorneys fees[3] |
| $433,062.10 | (Total) |

7.    COSMOTRADE requested that DOUBLE HAPPINESS provide counter-security but DOUBLE HAPPINESS has refused.

Dated: New York, New York
       January 18, 2008

Peter J. Gutowski (PG 2200)

---

[1] In the London submissions, COSMOTRADE has set forth two damage calculations, one based upon its final hire statement reflecting $446,950.05 in damages, and another based upon clause 101 of the charter contract which would entitle it to additional offhire periods resulting in damages of $553,748.30. This application for counter-security seeks the greater amount so that COSMOTRADE will not be left undersecured.

[2] Plaintiff's interest calculation amounted to a 40% add-on to the principal unsecured sum which, it is submitted, is extraordinarily high and excessive. COSMOTRADE reserves its right to seek a reduction in the quantum of security obtained by DOUBLE HAPPINESS for such interest.

[3] Plaintiff's request for security for a potential award of costs is some $65,000 higher, which, it is submitted, is also extraordinarily high and excessive. COSMOTRADE reserves its right to seek a reduction in the quantum of security obtained by DOUBLE HAPPINESS for such costs.

# EX. A

<u>IN THE MATTER OF THE ARBITRATION ACT 1996</u>

<u>AND</u>

<u>IN THE MATTER OF AN ARBITRATION</u>

B E T W E E N :

DOUBLE HAPPINESS SHIPPING COMPANY LIMITED

<u>Claimants (Owners)</u>

- and -

COSMOTRADE EXPORTS SA OF BVI

<u>Respondents (Charterers)</u>

MV "ALEXIA M" - C/P D 12.04.2007

CLAIM SUBMISSIONS

1    At all material times, the Claimants were the Owners of the m.v. "ALEXIA M" (the "Vessel"). By a Fixture Recap dated 12.04.07 (incorporating the terms of the MV "MANA"/COSMOTRADE Time Charterparty on amended New York Produce Exchange Form dated 18.11.05) (the "Charter"), the Claimants chartered the Vessel to the Respondents for the carriage of a cargo of *"STEEL PLATES/SHEETS AND STEEL PIPES A/O OTHER GENS/BLK."….. "DRTN ABT 40 DAYS WOG".*

2    The Charter to which Claimants will refer and rely on for its full terms and effect provided *inter alia* as follows:

<u>Fixture Recap</u>

*"HIRE USD 18,000 PD PAYABLE EVERY 15 DAYS IN ADVANCE TO OWS'*
*NOMINATED BANK ACCT. HIRE/TIME TO START COUNTING AT 00:01*
*HRS ON THE 12th APRIL '07".*

*"ENGLISH LAW, LONDON ARBITRATION TO APPLY"*

<u>Clause 5</u>

*"Payment of said hire to be made in See Clause 5A every 15 days in advance, and for the last 15*
*days or part of the same the approximate amount of hire, and should same not cover the actual time,*
*hire is to be paid for the balance day by day, as it becomes due, if so required by Owners, unless bank*
*guarantee or deposit is made by Charterers........."*

<u>Clause 5A</u>

*"Payment of hire shall be made by Charterers, in cash every 15 days in advance so as to be received*
*by Owners or their designated payee in London in United States currency on due date, free of any*
*bank/transfer charges or commission.*

*Payment of hire "in cash every 15 days in advance" shall mean that on the day hire is due Charterers*
*to transfer funds from London to Owners' designated bank account with reference to the vessel's*
*name.... "*

<u>Clause 54</u>

*"This agreement shall be governed by English Law and any dispute arising out of this agreement*
*shall be referred to arbitration in London.......If two arbitrators properly appointed shall not agree*
*they shall appoint an umpire whose decision shall be final".*

<u>Clause 77 (as amended by the Fixture Recap)</u>

*"A) Charterers have the right to withold from charter-hire during the period of this charter such*
*amounts due to them for UNDISPUTED off-hire and Owners' disbursements, but with proper*
*supporting statements to be sent to Owners promptly BUT MAX USD 500 PER PORT*

LONDON-4425660.1

*UNLESS EXPENSES INCURRED BY OWNERS EXCEEDS THIS AMOUNT IN WHICH THE ACTUAL AMOUNT BE DEDUCTED. Charterers have the right to withold from charter hires Owners' estimated disbursements BUT MAX USD 500 PER PORT."*

A copy of the Fixture Recap and underlying Charter is provided at pages 1 to 34 of Schedule 1 attached hereto.

3    The Vessel was delivered to the Respondents at Batumi on 11 April 2007 at 20:01 hrs GMT.

4    The Vessel was subsequently re-delivered to Claimants at Mumbai on 22 June 2006 at 06:36 hrs GMT.

5    On 30 July 2007, Claimants provided Respondents with their Prefinal Hire Statement which appears at page 35 of Schedule 1 showing a balance of hire in the amount of US$339,651.26 due to Claimants.

6    Wrongfully, unlawfully and in breach of Charter, Respondents have failed to pay outstanding hire in the amount of US$339,651.26.

7    By reason of the said breach of Charter as referred to at paragraph 6 above, Claimants have suffered loss and/or damage amounting to US$339,651.26.

8    Further, the Claimants claim interest pursuant to Section 49 of the Arbitration Act 1996 on such sums and at such rate and for such periods as the Tribunal shall think just.

AND THE CLAIMANTS CLAIM:

(a)    The sum of US$339,651.26 as referred to at paragraphs 6 and 7 above, and/or damages; and

(b)    Interest pursuant to Section 49 of the Arbitration Act 1996; and

(c)    Costs

LONDON-4425560.1

Served this 3 day of August 2007 by Reed Smith Richards Butler LLP, Beaufort House, 15 St Botolph Street, London, EC3A 7EE, Solicitors for the Claimants.

LONDON-4425560.1

24th September 2007

Alan Oakley                                  Clive Aston

Hoy's Farm,                                  Consult Marine Ltd,

Upwick Green,                                30 Hobbs Court

Albury, Ware,                                2 Jacob Street,

Hertfordshire SG11 2LD                       London SE1 2BG

England                                      England

Dear Sirs,

**Re: Alexia M – c/p dd 12.4.07/Cosmotrade Exports S.A.**

We refer to the Claim Submissions forwarded by Messrs Reed Smith Richards Butler for Owners, and would be obliged if the Tribunal would accept this letter and accompanying documents as the Charterers', Messrs Cosmotrade Exports S.A., Defence and Counterclaim Submissions.

1.    Paragraphs 1 to 4 of the Claim Submissions are admitted.

2.    It is admitted that on 30th July the Owners forwarded a prefinal hire statement showing that $339,61.26 is due to Owners. It is denied that this sum, or any sum is due to Owners. On the Contrary, Charterers' final hire statement of 19th July, attached at pages 33 to 35 hereafter shows that $470,039.26 is due to the Charterers.

3.   It is denied, under paragraphs 6, 7 and 8 of the Claim Submissions, that Charterers have committed any breach of Charterer and/or failed to pay hire. It is further denied that Owners have suffered any loss and/or damages. As the Tribunal will see below, it was in fact the Owners who committed multiple and persistent breaches of Charter, as a result of which the Charterers are due the sum $470,039.26 as per their final hire statement of 19th July.

4.   We believe it would be helpful to the Tribunal if we set out the background and history of the vessel's itinerary (to the extent that it is known to Charterers in advance of disclosure). The itinerary was:

-   Charterparty dated 13th April 2007
-   Vessel arrived at Constantza/Agigea 14th April 2007, for loading
-   Commenced loading at Agigea, 14th April 2007
-   Completed loading at Agigea, 27th April 2007, shift to Constantza
-   Commenced loading at Constantza, 27th April 2007
-   Completed loading at Constantza, 1st May 2007, sailed
-   Arrival Port Said 5th May 2007
-   Departure Suez 6th May 2007
-   Stoppage Red Sea 8th/9th May 2007
-   Arrived Aden 12th May 2007
-   Departed Aden 13th May 2007
-   Arrived India 19th May 2007 and, according to the log, anchored
-   Anchored Sikka, 2nd June 2007 (according to the deck log)
-   Commenced discharging Sikka 3rd June 2007
-   Completed discharging Sikka 10th June 2007
-   Arrived Mumbai 12th June 2007
-   Commenced discharging Mumbai 13th June 2007
-   Completed discharging Mumbai 22nd June 2007, vessel sailed and redelivered

2

5.   The history of this charter and of the vessel is one of a succession of
     defaults and breaches on the part of the Owners giving rise to claims in
     damages and off hire on the part of the Charterers:

   a.  The cranes of the vessel were misdescribed and/or defective.
       Described as capable of lifting 16 tonnes, the maximum they could
       lift was only 10 tonnes.
   b.  The cranes suffered numerous breakdowns.
   c.  This gave rise to delay and additional expense to Charterers at the
       loading ports.   The Charterers accordingly made deductions from
       hire.
   d.  By a letter dated 1st May, upon completion of loading, addressed by
       the Master to the port agent at Constanza, the Master sought to
       impose conditions and restrictions on the form and content of bills of
       lading in excess of Owners' entitlement under the charter party.
       The letter is stated to be *"as per Charterers' instructions"*.  This is
       not true. Charterers did not ask for authority circumscribed in this
       way.
   e.  At Port Said, en route from Constantza to India, on 5th May 2007,
       the Owners embarked a technician, a Mr Papaioannou.  Pending
       disclosure we do not know Mr Papaionnou's speciality.   Mr
       Papaioannou stayed on board until Sikka, where he departed on 4th
       June 2007.
   f.  From 2054 on 8th May to 1739 on 9th May the vessel reported that it
       had stopped engines in the Red Sea.   Pending disclosure we do not
       know the cause of the stoppage.
   g.  By an exchange of messages on 8th and 9th May the Charterers
       advised, and the Owners agreed, that the first port of discharge
       would be Sikka, as had been referred to in the Master's Voyage

3

Instructions.   The Charterers provided the Owners with a Letter of Indemnity in this respect, as requested by the Owners.

h.  Without any notice to Charterers or to cargo interests, the vessel deviated from the direct route and made a secret call at Aden where she took on board fresh water and spare parts.   The vessel arrived at Aden at 2020 on 12th May and departed at 2135 on 13th May. Pending disclosure we do not know what spare parts were placed on board or why they were needed.   There should have been no need for the vessel to make an intermediate call for fresh water.

i.  Purporting to rely on the Master's letter referred to at (d) above the Owners failed to give their approval to draft bills of lading notwithstanding that these were in compliance with the requirements of the charter party.   In accordance with clause 92 of the charterparty, on the 4th May the Charterers had sent to Owners drafts of the proposed bills of lading for the pipes loaded at Constantza. The condition of the cargo was recorded on the front of the bills. The remarks repeat those made in the mate's receipts.  The bills were stamped "FIOS".

j.  From  noon on 12th May onwards (that is, before the secret call at Aden) the Master failed to report his position to Charterers,  failed to give notice of his estimated arrival to Charterers or the discharge port agents, failed to report his position to the Charterers' weather routing contractor,  switched off or disconnected all means of communication with the vessel,  failed to respond to messages and to attempts to contact him by VHF,   disconnected his  GMS and Inmarsat systems and generally ceased following the Charterers' orders and instructions.

k.  As a result of negotiations initiated at a meeting between the Owners and Charterers held on 17th May, on 19th May, agreement was reached that  Charterers would pay US$70,000 to Owners on account of hire, and would deposit a further US$140,000 into escrow pending

4

resolution of the claims for damages and/or off hire arising from the misdescription and/or inefficiency of the cranes.

l. The Owners, having earlier agreed to a change of destination from Kandla to Sikka for part of the cargo first to be discharged, and having been supplied by Charterers with a Letter of Indemnity in this respect, in disregard for Charterers' orders, directed the vessel to proceed to Kandla instead of to Sikka. Between 8th May and 0957 hours GMT on the 11th May, the Master gave ETAs for the vessel's arrival in Sikka as being the 18th May. However at 1905 hours on the 11th May he advised the Charterers and their agents that in accordance with the Owners' instructions he was proceeding to Kandla as a first discharge port where the ETA was 0700 hours local time on the 18th May. The Master declared his arrival off Kandla on 19th May.

m. Kandla and Sikka are approximately 60 miles apart. The Owners gave no indication as to where the vessel was, but the deck log shows the vessel as having anchored off Kandla. The Master declared that he would not permit cargo to be discharged until Charterers had paid *"long overdue"* hire and *"problems"* were settled.

n. The vessel appears to have remained at this position from 19th May until 2nd June refusing to follow the Charterers instructions to proceed to and discharge cargo at Sikka.

o. The Owners accused the Charterers of having issued clean bills of lading not containing the remarks set out in the Mate's receipts and in the draft bills of lading; of having issued liner bills of lading which are not permitted by the charter party; of having issued multiple bills of lading, and generally of having issued fraudulent bills of lading.

p. Coupled with these accusations, the Owners laid down conditions for the delivery of the cargo at Sikka.

q. At the insistence of Owners, on 1st June 2007 Charterers signed and procured the signature of their sub-charterers to, a document drawn up by Owners' lawyer, entitled "Deed of Indemnity, Waiver and Agreement". Only then did the vessel proceed to Sikka and discharge cargo there.

r. The Master failed to supply the Charterers with log abstracts and voyage reports as required by Clause 46 of the charterparty.

s. The Master and Owners failed to supply copies of the log books when requested to do so as required by Clause 11.

t. The logs books have been drawn up showing the vessel steaming at sea on occasions when the ship was stopped.

u. Mr Papaioannou disembarked the vessel at Sikka but his place was taken by another technician, Mr Markoutsas who joined the vessel in the next port, Mumbai. Mr Markoutsas was still on board when the vessel was redelivered from time charter. Pending disclosure we do not know Mr Markoutsas' speciality, or the purpose of his presence on board.

v. At the second discharging port, Mumbai, the Owners refused to jointly attend and/or allow the Charterers' surveyor to inspect or to test the vessel's cranes.

w. Following receipt of copies of the engine logs it transpires that there were further engine stoppages which were not reported by either the Master or the Owners.

x. Following redelivery the vessel has since been taken to China where she arrived on or about 17th August for repairs. The vessel is at present engaged in very lengthy repairs, which, over a month after arrival, are still on-going. Pending disclosure we do not know the precise nature of these repairs, but for Owners to take the vessel out of service for such a long period on a high freight market they must be extremely serious.

6.    Having set out the general background to this matter above, we will now address the issues in more detail below.

Loading at Agigea/Constantza

7.    The vessel arrived on 14th April 2007 at the Port of Agigea/Constantza to load a cargo of steel plates and steel pipes. We attach at pages 36 to 38 the Statement of Facts. For the guidance of the Tribunal the vessel first loaded at the Agigea part of the port, and then shifted to the Constantza part of the port on 27th April to complete loading.   The vessel was scheduled to load  18,444 tonnes of steel plates, pipes and  sheet at Agigea, and  4,770 tonnes of steel pipes at Constantza.  The bulk of the cargo to be loaded at Agigea (from the 18,444 tonnes) was 15,013 tonnes of steel plates.

8.    The Charterparty provides, inter alia

      at line 21;

      "*Vessel on her delivery to be ready to receive any permissible cargo ……
      tight, staunch, strong and in every way fitted for ordinary cargo the
      service, and shall remain so far the currency of this timecharter…..*"

      Clause 1;

      "*That the Owners shall….. maintain her Class and keep the vessel in a
      thoroughly efficient state in hull, machinery and equipment for an during
      the service.*"

      Clause 8;

*"That the Captain shall prosecute his voyages with utmost dispatch, and shall render all customary assistance...."*

Clause 15;

*That in the event of the loss of time from deficiency and/or default of crew or officers and/or deficiency of men or stores, unless caused by Charterers and/or their servants fire, breakdown or damages to hull, machinery or equipment, grounding, detention by average accidents to ship or cargo, or oil pollution only due to ship's fault, drydocking for the purpose of examination or painting bottom, or by any other cause preventing the full working of the vessel, or any extra delay in consequence thereof the payment of hire shall cease for the actual time thereby actually lost; and if upon the voyage the speed be reduced by defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence thereof, and all extra relevant expenses fully documented or telex/fax received from relevant agents shall be deducted from the hire.*

Clause 22;

*"Owners shall maintain the gear of the ship as fitted, providing gear (for all cranes) capable of handling lifts up to maximum capacity also as per description."*

Clause 23;

*"Vessel to work night and day, if required by Charterers, and all cargo gear to be at Charterers' disposal during loading and discharging."*

"In the event of a disabled crane or derricks winch or winches, or insufficient power to operate winches. Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned thereby. In such case vessel to remain on full hire."

Clause 101

*Maintenance of vessel's gear and equipment*

*All cargo handling gear and equipment including derricks/cranes/winches to be maintained in good working order by Owners. In the event of a breakdown or malfunction of derrick(s), crane(s), winch(es) by reason of damage, disrepair, disablement or insufficient power, the hire to be deducted pro-rata for a period of such insufficiency in relation to the number of gangs-affected and any stevedore standby costs incurred are to be for Owners' account but max to present shift. Alternatively, Owners have the option to hire shore gears, in which case Owners to pay for the relevant cost but vessel to remain fully on hire.*

The description clause states;

*"Cranes 4/16 TS"*

*"Vsl's gear can serve all hatches."*

9.    Having fixed a vessel with cranes warranted as capable of lifting 16 tons, the cargo, which was to be loaded onto the vessel from barges in Agigea, was arranged in the barges such that each lift was up to 16 tonnes, including a loading beam.   For the purpose of loading the steel plates, the stevedores used a loading beam which weighed 0,958 tonnes. The expected loading rate of the vessel was 1,400 – 1,500 tonnes per gang per

day (of 24 hours) as per the message from the agent at page 39. Subject to the weather, the vessel should load between 5,600 – 6,000 tons per day working 4 gangs.

10. It was intended that 4 gangs would load the ship throughout her stay at Agigea. However as the vessel did not start loading until late on Saturday night (14th April) and with rain forecast for the week-end, the loading agents Messrs Romtrans arranged only for 1 gang for Saturday night/Sunday. We refer to the message from Romtrans dated 14th April (at page 40) and the message from Cosmotrade's agents, Messrs Aries dated 17th April (page 41).

11. Loading of the steel plates commenced on Saturday 14th April at 2100. Loading took place on a 24 hour basis, with 2 shifts, one from 0700-1900 and the other between 1900-0700.

12. There were problems almost from the commencement of loading. No.2 crane started to suffer from breakdowns early on 15th April. The Tribunal will see from the Statement of Facts that not a single day passed at Agigea without one of the cranes suffering a breakdown. All 4 cranes had problems. Aside from the breakdowns however there was a far more serious problem. The cranes were not capable of lifting 16 tons as provided by the Charterparty. On Monday 16th April the Master issued a letter instructing that the cranes were to lift bundles only to the equivalent of 10 metric tonnes (page 42). The result of this was that the cargo, which had been arranged in the barges such that each lift, including the loading beam would weigh up to 16 tons, had to be unbundled, and re-bundled in order not to exceed the 10 tons as instructed by the Master.

13. The implications of the Master's 10 ton limitation were serious. As set out above, the bulk of the cargo to be loaded at Agigea was steel plates. We

attach at pages 43 to 79 the packing list for all the plates loaded at Agigea. The Tribunal will see that most of the plates weighed 4.967 tonnes and 5.947 tonnes. With a safe working load of 16 tons the crane should have been capable of lifting 3 of the plates weighing 4.967 tonnes plus the lifting beam (which weighed 0.958 tonnes) or 2 of the 5.947 tonne plates. However, with the Master's restriction the crane could only lift 1 plate at a time. This effectively increased the loading time by double and triple.

14. The vessel, with all her cranes working at the warranted 16 tonnes should have been able to load the entire cargo at Agigea in around 3-4 days - we refer to Tribunal to paragraph 9 above. We also refer the Tribunal to the message from Aries at page 80 advising that the expected loading time for the Agigea cargo was "*maximum 4 days*".

15. In addition to the greatly reduced ability to lift the plates as set out in paragraph 13 above, the Master's limitation had a further serious implication on the loading schedule. As set out in paragraph 9 above, the cargo was arranged in the barges such that each lift, including the loading beam, was up to 16 tonnes. Because the Master now restricted each lift, the cargo had to be re-arranged in the barges such that each lift did not exceed the 10 tonnes stipulated by the Master. That involved the re-allocation of gangs handling the cargo. For Monday 16th April, after the week-end, Romtrans had arranged for 4 gangs to load the ship. We refer to the letter from Romtrans dated 16th April at page 81. Romtrans advised in their message, in light of the crane problems over the week end, that they reserved the right to reduce the number of gangs in the event of crane deficiencies.

16. The vessel's cranes were surveyed at Agigea by Messrs Break Bulk Services on 16th April. Their report is attached hereafter at pages 82 to 88. The Tribunal will see that the cranes were unable to lift 16 tons. The

11

Master signed a joint statement, attached to the report, confirming that the cranes were unfit to handle the test weight of 15.86 tons.

17. As set out in paragraph 15 above, the Master's limitation on the weight of bundles resulted in gangs being re-allocated to the barges to rearrange the bundles such that they did not exceed 10 tons (with the lifting beam). While Romtrans had arranged for 4 gangs to load the ship from Monday 16th April (ref paragraph 15 above), 2-3 of these gangs had to be re-allocated to sort the cargo out in the barges. We refer the Tribunal to the latter from Romtrans dated 17th April attached at page 89. As a result, the ship never worked with more than 1-2 gangs on board (as is shown in the Statement of Facts) whilst the remaining 2-3 gangs were employed on the barges to rearrange the cargo in order to comply with the Master's limitation. This only served to further delay the loading. Romtrans protested to the Master on 18th April that the Master's restriction was causing *"huge delays"* (page 90).

18. Just before the vessel completed loading at Agigea, on 26th April, the Master gave authority to arrange for the supply of a floating crane (page 91). However this was of no benefit because the Master still maintained his 10 ton limitation on the weight of each lift (page 92) because the vessel still had to discharge the cargo using her deficient cranes at the discharge port.

19. Loading of the Agigea cargo completed on the morning of 27th April and the vessel shifted to Constantza to load the balance of the cargo of pipes.

20. The loading of the pipes at Constantza did not involve the same problems that had been experienced at Agigea because the pipes were lighter and were loaded from the quay not from barges. No rebundling of cargo was required.

21. The ship completed loading on 1st May 2007. The Statement of Facts records *"since vessel arrived at Agigea port all ship's crane cannot lift more than 10 tons heavy. Caused vessel's slow loading operation and delay at Agigea and Constantza port."* The Master, no doubt in an attempt to cover the deficiencies of his cranes wrote *"no crane breakdown caused of delayed they did not provide more gangs"*. This statement also ignores the agent's reference to the *"huge delays"* that the crane problems had caused, and the fact that the gangs had to be re-assigned to the barges.

The Master's letter authorizing signature of bills of lading

22. Upon completion of loading the Master gave a letter authority to the agent to issue bills of lading on his behalf. As set out in paragraph 5 d above, the letter sought to impose conditions and restrictions on the form and content of bills of lading in excess of the Master's/Owners' entitlement under the charter party. Clause 8 of the charterparty provides:

*"..the Captain...is to sign Bills of Lading for cargo as presented, in strict accordance with Mate's receipts."*

Clause 92 of the charterparty provides that:

*"Owners/Master to release to Charterers or their agents authority to sign Bills of Lading on their behalf, provided in strict accordance with mate receipts.*

*In case Bills of Lading signed by Charterers or their Agents same to be in strict conformity with Mates Receipts and draft copy of Bills of*

*Lading to be approved by Owners/Managers before issuing. Also a copy of the issued original Bls/l to be sent to Owners for their perusal.*

*In case of "Clean on Board" Bills of Lading is Master's right to reject any damaged cargo, prior loading of same on board, affecting the issuance of "Clean" Bills and Shippers / Charterers to replace same with sound cargo at Charterers / Shippers time and expense.. In case Charterers request Master to load such cargo then relevant remarks to be inserted in Bills of Lading. Chtrs to give relevant instructions to master well in advance.*

*No liner/no through bills of lading will be issued under this Charter Party."*

Contrary to the terms of Clause 8 and Clause 92, as the Tribunal will see from the Master's letter of authority at pages 93 to 94 the Master sought to impose terms and conditions in the bills of lading, in excess of his entitlement under the charterparty. In particular he sought to turn Owners bills of lading into Charterers' bills with the condition that *"Bs/l to be signed 'for and on behalf of Charterers m/s Cosmotrade Exports SA' as per c/p dd 12 April 2007".* The Charterparty says nothing of the sort.

23.  As set out in paragraph 5 i above, in accordance with clause 92 of the charterparty, on the 4th May the Charterers sent to Owners drafts of the proposed bills of lading for the pipes loaded at Constantza. The condition of the cargo was recorded on the front of the bills. The remarks repeat those made in the mate's receipts. The bills were stamped "FIOS". Copies of the Mate's Receipts for this cargo are attached at pages 95 to 105. The Charterers' covering message, and the draft bills of lading are attached at pages 106 to 119.

24. The Owners' response on 7th May was to insist that the intended bills of lading conform to the Master's authorization letter, and that Cosmotrade appear as Carriers. See pages 120-121. The Charterers responded pointing out that the Charterparty did not provide for Charterers to appear as carriers under the bills of lading (page 122). The Owners however simply reiterated their position, adding that Charterers' claims regarding the cranes were rejected. See page 123.

Stoppages during the voyage to India

25. On the voyage to India the vessel suffered a main engine problem which resulted in the vessel stopping for a period reported by the Master as being between 2054 on 8th May to 1739 on 9th May. However, following a perusal of the engine log book it transpires that this was not the only stoppage. There were other stoppages which the vessel/Owners concealed from the Charterers.

(i)    At Page 07-08.05.2007 of the engine log appears the remark *"start main engine 0615 hrs"* (being on 08.05.07).

However, there is no prior entry to indicate when the main engine was stopped. It is however possible to ascertain for how long the ship stopped. The following table lists the main engine revolutions recorded in the engine log:

| Item A | Watch B | RPM C | Revolutions/watch D | Revolution counter E |
|--------|---------|-------|---------------------|----------------------|
|        |         |       |                     | 42733890             |

15

| | | | | |
|---|---|---|---|---|
| 1 | 12 | 16 | 95,5 | 22920 | 42756810 |
| 2 | 16 | 20 | 97,1 | 23310 | 42780120 |
| 3 | 20 | 24 | 92,4 | 22180 | 42802300 |
| 4 | 0 | 4 | 98,4 | *23616* | *42825916* |
| 5 | 4 | 8 | 99,5 | *23880* | 42817190 |
| 6 | 8 | 12 | 95,0 | 22790 | 42839980 |
| 7 | | | 578 | 138696 | 83170 |
| 8 | | | 96,3 | 96,3 | 57,8 |
| 9 | | | | 23116 | 55526 |

The entries in columns D and E are those taken from the log. The entries in italics do not appear in the log because during those periods the writer of the log has left them blank. It is however possible to calculate those figures.

Taking the "Revolution counter" figures E1 and E6, the difference between the two is 83170 (figure E7). Dividing this figure by 1,440 minutes/day, the mean average RPM is 57,8 (figure E8). The mean average RPM entered in the log book is much higher at 96,3 (figures D8 & C8). It can be seen that the RPMs of the watches 0-4 & of 4-8 (figures C4 and C5) are higher than during the other watches.

From the above it can be concluded that during the watches of 0-4 and of 4-8, the main engine was stopped for some unknown reason and presumably in order to cover-up this stoppage, the crew appear to have increased arbitrarily the recorded revolutions during the above two watches.

The actual stoppage is calculated as follows:

- The sum of the alleged revolution/watch is 138696 (figure D7)

16

- The sum of the actual revolution/watch is    <u>83170 (figure E7)</u>
- The difference between the above is          55526  (figure E9)
- The mean average revolution/watch is 23116 (figure D9)
- Dividing  the E9 by D9 we can find the number of watches during which the main engine was stopped, that is;  2.402 watches.
- Each watch is 4 hours long, so multiplying the above period of 2.402 watches x 4 hrs = 9.6 hrs

Therefore the time that the main engine was stopped on 08.05.07 when the log only records the engine being restarted, is: 9.6 hours

(ii)  There were 2 further, short unreported stoppages on 15th May.  The engine log records at pages 14-15.5.0227 *"Stop main piston pump 0350 hrs, resume at 0400 hrs/Stop again at 0700 hrs started 0730"*. The combined total of these stoppages is just 40 minutes (0.56 hours) although in reality it is likely that the ship lost much more than this time whilst slowing down and starting up between each of the two stoppages.  (As the Tribunal will be aware, the ship can not simply stop and start, the fuel for the main engine must be  changed from heavy fuel oil to lighter diesel before slowing down and stopping).

(iii)  Finally, with respect to the stoppage on 8th/9th May as referred to at the head of this paragraph, the Master reported the stoppage as being between 2054 on 8th May to 1739 on 9th May.  The Master's message is attached at page 124.  Perusal of the engine log book records that the stoppage was in fact almost 5 hours longer.  The engine log records on the days 9-10.5.2007 *"2230 hrs ME start"* (page 125), as opposed to the 1739 reported  - the following day - by the Master. The deck log book records a stoppage time of 2054 on 8th May and a resumption of sea passage at 1739 on 9th May, but bizarrely, whilst the ship was stopped, each of the watches between these two

17

dates/times records GPS positions as if the vessel were sailing at full speed.  It is as if the log had been drawn up, watch by watch, as if there were no stoppages, and then the two entries at 2054 and 1739 have subsequently been entered without regard for all the intervening satellite positions.    Copies of the deck log for the two days are attached at pages 126 to 129.

### The unauthorized call at Aden

26.  The vessel then made an unauthorized call at Aden.  Neither the Master nor the Owners advised Charterers of this call.  Indeed, and no doubt in an attempt to conceal this call, the Master stopped giving his noon positions after the noon 12th May position, and did not give another position until 5 days later on 17th May.  Charterers had requested the Master to provide the missing noon reports, but to no avail (page 130).  The Master had also stopped reporting to the weather routing company employed by Charterers (page 131).  The vessel, unbeknown to Charterers called at Aden between 2020 on 12th May and 2135 on 13th May.  The reason for the call, as reported by the Harbour Master (page 132) as declared by the Master, was due to *"engine trouble"* and *"for supply of fresh water"*.  In fact the vessel took the considerable quantity of 150 tons of fresh water.  The fresh water consumption of a vessel the type and size of Alexia M would be around 7-8 tons per day.  The Owners had taken on board fresh water which would last for some 20 days, despite the vessel being only 5-6 days away from the discharge port.  The vessel had already been supplied with 150 tons of fresh water at Constantza..  Pending disclosure and the reason why the Owners took so much fresh water, the Charterers reserve the right to re-address this issue.  The vessel also took spares at Aden.  A call for supply of spares and fresh water should not take more than the one day that the ship remained at Aden.  The Charterers will address this issue in more

detail following disclosure. According to the engine log the ship did not stop at Aden. The entries throughout the 12th and 13th May show the vessel steaming, with detailed watch records of temperatures, pressures, bunker consumptions and main engine revolutions. The deck log is similar to the period 8th/9[th] May referred to in paragraph 25 (iii) above in that the stop and Aden on 12th is recorded, as is the departure on 13th May, but in between the log records changing positions by GPS each watch, course steered, sea conditions, and generally entries that would be expected when a ship is steaming at sea. It is as if the deck logs has been drawn up as if the ship was at sea, steaming throughout the period, and the call at Aden has been inserted later.

27.  The call at Aden was a deviation under the bills of lading thereby depriving the Owners of the protection of the Hague Rules or other protective clauses in the event of claims by cargo interests, and also putting Owners at risk of losing their P&I cover.

<u>The Charterer's deductions for the delays at loading</u>

28.  With respect to the delays at Agigea the vessel's charterparty description, as referred to in paragraph 8 above, stated *"cranes 4/16 ts"* meaning that the 4 cranes are described, and warranted as able to lift 16 tons. The cranes could lift no more than 10 tons. The Charterers accordingly calculated their damages/off hire claims. They did so in 2 stages. First the Charterers claimed that as a result of the need to re-bundle the cargo, the whole loading operation took twice as long as required. Charterers therefore made a 50% deduction as damages/off-hire. This is in line with the position set out in paragraphs 13 and 17 above. Charterers then made a further pro-rata deduction on the basis that the cranes, lifting up to 10 tons only, rather than 16 tons, were working slower and thereby losing time, to the ratio 10/16. Finally, Charterers made a deduction of hire as off-hire for

the periods when cranes were not working at all, as provided by the statement of facts. (The Owners initially accepted the off-hire at Agigea/Constantza, albeit under the reference in their hire statement 'without prejudice' attached at page 133. However they subsequently withdrew this acceptance, despite the contents of the Agigea/Constantza Statement of Facts, immediately before the service of their Submissions). The Charterers also made a further deduction of $70,000 for a shortloading claim. However this was subsequently reimbursed. The Charterers hire statement, and accompanying explanation, sent on 4th May 2007, are attached hereafter at page 134 to 137. These deductions were disputed by the Owners. The Owners' P&I club, who were presumably not advised by Owners of the serious problems with the cranes at the loadport and the Charterers' substantial claims in damages, sent a message to Charterers, on 10th May calling upon Charterers to pay the hire in full (page 138). The Charterers were entitled to make the deductions they had made by way of equitable set-off as is referred in more detail herebelow at paragraph 45.

The change of destination

29.   As set out in paragraph 5 g above, the Owners had agreed to a change of destination from Kandla to Sikka and provided the Charterers with the wording of the Letter of Indemnity they required, which Charterers duly completed and returned. The request from Charterers for a change of destination, sent on 8th May 2007 is attached at page 139. The Tribunal will see that Charterers also sought the Owners' confirmation to the draft bills of lading which had already been sent, 3 days earlier, for the Kandla cargo (paragraph 23 above), which would now be discharged at Sikka instead. The Owners replied on 9th May 2007, with the wording for a Letter of Indemnity they required. This message is attached at pages 140 to 144. The Charterers' complied on the same day, sending to Owners the

20

completed LOIs as attached at pages 145 -149. Further, the Charterers' message to the Master concerning the change of destination, and the Master's acknowledgement are attached at pages 150 to 151. The Owners however subsequently withdrew from their agreement to proceed to and discharge first at Sikka instead of Kandla. As set out in paragraph 5 1 above, up to 0957 hours GMT on the 11th May, the Master gave ETAs for the vessel's arrival in Sikka as being the 18th May. However at 1905 hours on the 11th May he advised the Charterers and their agents that in accordance with the Owners' instructions he was proceeding to Kandla as a first discharge port where the ETA was 0700 hours local time on the 18th May. The Master's message is attached at page 152 hereafter. The Owners, on 16th May informed the agents in India that the vessel would not discharge any cargo because, they claimed, hire had not been paid (page 153). No doubt on instructions from the Owners, the Master discontinued communication with Charterers and Agents, and switched off his satellite systems so the whereabouts of the vessel could not be determined by the weather routing company. In short the vessel became incommunicado. Neither Charterers not agents knew where she was. Neither could establish communication with her. Neither knew when or whether she would arrive at the discharge port.

<u>The Interim Escrow Agreement</u>

30. Clearly this conduct on the part of the Owners was designed to pressurize the Charterers into concessions with regard to the deductions from hire which Charterers had made. On 17th May a meeting was held between the Owners and the Charterers. The meeting did not immediately result in any agreement, but by 19th May the Charterers had accepted the Owners' terms and an interim agreement had been reached for part payment and part deposit in escrow (page 154).

31. 19th May was a Saturday so the payment to Owners was not able to be made that day. Payment to Owners was effected on the following Tuesday, 22nd. Arrangements for the escrow took some days longer, but the agreed escrow funds were remitted on 24th May.

The Refusal to Proceed

32. Meanwhile the vessel reported her ETA Kandla and that she had arrived at Kandla outer anchorage at 1345 on 19th May. (page 155). The Master stated clearly that as per the Owners' instructions the vessel would not allow discharge until the Charterers *"pay long overdue hire + problems be settled."* As indicated above, the Charterers did not know the precise position of the vessel at this time, but on the basis of the Master's message of 19th May she appeared to be somewhere between Kandla and Sikka. Notwithstanding the Master's reported arrival, the agent advised that the Master continued to avoid taking calls on the VHF. A copy of the Charterer's protest message to the Master, sent on 19th May, is found at page 156.

33. The precise location where the vessel anchored may not be of importance for wherever she may have been it was clear from the Master's message as referred to in paragraph 32 above, that he was instructed by the Owners not to discharge any cargo.

34. One might have been forgiven for assuming that once Charterers had conceded to Owners' terms and agreement had been reached on 19th May, the *"problems"* referred to in the Master's message of 19th had been resolved. Or if not on 19th, then on Tuesday, 22nd when the agreed sum of US$70,000 was remitted to Owners, and if not then, certainly by 24th when a slightly increased sum of US$148,000 was remitted to escrow. Unfortunately this was not the case. From 21st May onwards, the Owners

22

embarked on a campaign which appears to have been designed to make the Charterers agree to drop their claims. As stated above they accused Charterers of a series of alleged crimes.

a. They said Charterers had issued clean bills of lading not containing the remarks set out in the Mate's Receipts, this notwithstanding that the draft bills of lading sent to Owners for approval contained all of these remarks;

b. They said that Charterers had issued liner out bills of lading, this notwithstanding that the draft bills of lading sent to Owners for approval were clearing marked "*FIOS*";

c. They said that Charterers had issued multiple sets of bills of lading;

d. They continued to insist that any bills of lading should conform to the extra-contractual conditions contained in the Master's letter to the load port agent.

These accusations were first set out in a message from the Owners' lawyers, dated 21st May 2007. See pages 157 – 159.

35.    The Owners' threatened to:

i.    commence arbitration proceedings for recovery of unpaid hire amounting to $217,391.67;

ii.    seek security for $320,000 by action against the Charterers' assets;

iii.    withdraw the services of the ship "in *total or in part*";

iv.    contact the Shippers

v.    refuse to discharge the cargo at either Kandla or Sikka unless the Charterers first provided them with:

*"1. Evidence of the original Kandla and Mumbai Bills and evidence that they have been collected in and surrendered (such evidence including a signed letter from shippers and receivers confirming this fact).*

*2. Full details and evidence of current ownership of the Kandla and Mumbai cargoes together with letters from shippers, Letter of Credit banks and owners of the cargoes confirming a) that they agree to the Kandla cargo being discharged in Sikka and b) that they accept the present drafts of the Bills of lading.*

*3. Full details of the relevant letter of credit banks and confirmation appropriately claused bills.*

*4. Charterers' agreement that the Vessel will remain on hire throughout the period of inevitable delay which will arise whilst the above legitimate requests are being satisfied."*

36. In the message of 21st May and in subsequent messages, the Owners' lawyers stated the terms on which Owners would agree to discharge cargo at Sikka. From 24th May onwards the Owners' lawyers marked most of the messages "without prejudice". The Owners have declined to agree disclosure of those messages, and accordingly they are not attached to these Submissions. The Charterers do not agree that all of the messages marked "without prejudice" qualify as privileged from disclosure, and reserve the right to seek disclosure of same to the Tribunal in due course. For the time being only copies of correspondence before 24th May, or expressly stated to be open is attached at pages 160 – 180.

37. On 1st June the Charterers agreed to sign and to procure signature by their sub-charterers of a "Deed of Indemnity, Waiver and Agreement" a copy of which is attached at pages 181 to 183. Further monies of $153,295 were paid by Charterers into escrow, and on 2nd June the vessel presented

24

herself at Sikka for discharge. No doubt the Owners insistence and that of their lawyers on this document being signed as a Deed is indicative of a lack of consideration on their part for the agreement contained in the document. See in this respect Clause 1 g) of the Deed itself, at page 182.

## Discharge of cargo

38. The vessel arrived at Sikka on 2nd June and commenced discharging the next day. The Tribunal will see from the respective hire statements of Owners and Charterers that both parties are in agreement that the vessel was off hire at Sikka for 0.051215 days.

39. The vessel arrived at Mumbai on 12th June and started discharging on 13th June. Discharging was completed on 22nd June and the vessel sailed. She was redelivered back to Owners upon dropping the outward pilot at Mumbai. The Owners' final hire statement shows an off-hire at Mumbai of 0.301215 days although no breakdown is provided with Owners' Submissions or Owners' hire statement. The Tribunal will see that the Charterers had deducted 0.397572 days off-hire at Mumbai, as detailed in the Charterers' final hire statement of 19th July. We attach at pages 184 to 198 the Mumbai Statement of Facts which details the continuing problems with all the ship's cranes. The Tribunal will also see from the Mumbai Statement of Facts that the Master, on the Owners' instructions, refused to allow any testing of the ship's cranes.

40. The vessel was redelivered back to the Owners after dropping the outward pilot off Mumbai on 2nd June 2007.

41. On the basis of all the above we submit that there is no hire due to Owners and that Owners claim for reimbursement of hire should be dismissed.

25

<u>The Charterers' claims</u>

42.   We repeat the contents of the Defence Submissions above.

43.   The Charterers have the following claims in  damages and/or off-hire
      against the Owners:

      a    additional  time  taken  in  loading  cargo  by  reason  of  the
           deficiency/misdescription of the vessel's cranes;
      b    cost of bunkers consumed during the additional time taken to load;
      c    Additional disbursements at Constantza;
      d    off hire and bunkers consumed during the stoppages during the
           voyage
      e    off hire and bunkers consumed during the unauthorised deviation to,
           at, and from Aden;
      f    damages equivalent to the hire payable during the period of delay in
           arrival at the agreed first discharge port, and/or off-hire;
      g    the cost of bunkers consumed during this delay;
      h    delay and/or extra expenses/additional disbursements at discharging
           ports  by  reason  of  the  misdescription  and/or  inefficiency  of  the
           vessel's cranes.

44.   The basis for the deductions made at the time by Charterers for the crane
      problems/misdescription  have  been  set  out  in  paragraph  28  above.
      Charterers  have  since  revised  their  Final  Hire  Statement,  and  same  is
      attached hereafter at pages 199 to 200. The revised sum now claimed by
      the Charterers is $446,950.05. The Charterers' case is their measure of
      damages as a result of the misdescription of the vessel's cranes, and/or
      breaches  of  charterparty  clauses  set  out  in  Paragraph  8  above,  is  the

                                                                              26

difference between the time the ship should have taken to load, and the time that the ship actually took for loading. That difference may be calculated as follows.

- The vessel, with the cranes working to 16 tonne capacity, was expected to load around 1,400 to 1,500 tons per gang per day (paragraph 9 above).
- The ship arrived and berthed late on Saturday night, 14th April and only 1 gang had been arranged up to 0700 on the Monday morning, 16th. From commencement of loading at 2100 on 14th to 0700 on 16th the ship worked for 34 hours, less 2 hours for rain on 15th April. Over the 32 hours, at the lower expected loading rate of 1,400 tons/day the ship should have loaded 1,867 tonnes of cargo.
- As from 0700 on Monday 16th 4 gangs were scheduled to load the cargo, but did not for reasons set out in paragraph 17 above. The total Agigea cargo was 18,444 tons, of which 1,867 should have been loaded by 0700 on Monday 16th. That would leave 16,577 tonnes to be loaded. At a rate of 1,400 tons per gang per day x 4 gangs the ship would load 5,600 tons per day. With 16,577 tons remaining she should have completed within further 2.96 days. That would be at 0603 on 19th April. There was however rain between 0420 and 0845 on 18th and between 0330 and 1000 on 19th. That would push the expected completion time at Agigea to 1658, say 1700, on 19th April.
- In total, the time taken for the vessel to complete loading at Agigea should have been between 2100 on 14th and 1700 on 19th, which is 4.875 days.
- The vessel actually took from 2100 on 14th to 1115 on 27th, which is 12.594 days. During that period there were delays from the

shore side of 3 hours 15 minutes. This would reduce the 12.594 days to 12.459 days.

- The measure of Charterers' damages is 12.459 − 4.875 days = 7.584 days.

This figure has been included in the Charterers' revised final hire statement.

45.  The Charterers submit that they are entitled to deduct their damages claim set out in paragraph 44 above, by way of equitable set off. The Owners clearly breached the terms of the Charterparty by providing cranes which could not work to the warranted capacity. The Charterers are therefore entitled to damages for any loss that resulted. The Owners' breach of the Charterparty deprived the Charterers of part of the vessel's services or prejudiced the Charterers in the use of the vessel. Where a vessel does not reach its warranted speed, that failure has been held to deprive a charter of part of the vessels services (The Chyrsovalandoy Dyo [1971] 1 Lloyd's Rep.159). By analogy, a vessel, whose cranes do not reach their warranted lifting capacity has deprived the charterer of part of the vessel's services. The sum which Charterers have deducted from hire is a figure based on the actual time they expected the vessel to complete, based on the expected discharge rate. Charterers' deduction is correct and justified and Charterers are entitled to rely on equitable set-off.

46.  Further, and/or alternatively, Charterers are entitled to claim off-hire under the provisions of clause 15. The vessel was incapable of delivering the service that the Charterers required of her in that all the cranes were unable to lift 16 tonnes. The "full" working of the vessel was prevented. The time lost is 7.584 days as calculated in paragraph 44 above.

47. Further and/or alternatively, Charterers are entitled to claim off-hire under the provisions of clause 101. Clause 101 provides that *"in the event of a ……………malfunction of …..cranes……… the hire to be reduced pro-rata for a period of such inefficiency in relation to the number of gangs affected………."*. Charterers submit that the inclusion of the word "malfunction" in addition to the word breakdown, means that the clause applies to periods when the cranes are working, but only with impaired efficiency, as was the case of the Alexia M. There were crane malfunctions throughout the entire period of loading at Agigea, in that at no time could any crane lift the warranted 16 tons. These malfunctions affected all gangs operating and so, under the provisions of Clause 101, the vessel was off-hire for the entire duration of loading at Agigea. That would result in a change to the Charterers' final hire statement whereby the sum of $553,748.30. (being the remaining difference in loading time at Agigie, i.e., 5,01 days, or $86,798.25) is due to Charterers rather than $446,950.05 as appears at page 200 .

48. At the Constantza part of the port, the vessel loaded steel pipes from the shore and the full 16 tonne capacity of the ship's cranes was not required.

49. Similarly, during discharge at Sikka the steel pipes did not require the full 16 tonne capacity of the cranes.

50. At Mumbai the Charterers were again delayed by the reduced capacity of the cranes in discharging the steel plates.    As can be seen from the Mumbai Statement of Facts the Owners and Master refused further testing of the ship's cranes, no doubt because they were still incapable of meeting the warranted 16 tonne capacity.  The vessel discharged at Mumbai in 9.25 days, of which 1.517 days were not worked due to bad weather.  This leaves 7.733 working days. At Mumbai the problem with re-bundling was not present, but the discharge was extended by the reduced capacity of the

crane which could only lift up to 10 tonnes rather than 16 tonnes. The best calculation that Charterers can rely on for their damages claim is the ratio of the crane's actual capacity to warranted capacity, that is; 10t/16t. Applying this to the 7.733 working days above gives an expected discharge period of 4.833 days. The measure of the Charterers' damages is the difference between 7.733 days and 4.833 days, which is 2.9 days. This figure has been applied to the Charterers' revised Final Hire Statement.

51.   We repeat paragraphs 45, 46 and 47 above, with respect to the delays at Mumbai set out in paragraph 50 above.

52.   Charters have further revised their Final Hire Statement to incorporate the stoppages which have been established from the log books, as set out in Paragraph 25 above, but which were hidden from and/or undeclared to the Charterers. While revised Clause 77 of the Charterparty refers to the Charterers only being entitled to deduct *"undisputed off-hire"* we submit that Owners are not entitled to rely on such terms in circumstances, such as the present case, where Owners have deliberately concealed and/or failed to report stoppages.

53.   The unauthorized deviation to, at and from Aden has been deducted from hire. These off-hires have been admitted and accepted by the Owners. Charterers have also deducted the bunkers for these periods.

54.   Clause 6 provides, inter alia:

> *"That the cargo or cargoes be laden and/or discharged in any safe dock or any safe wharf or safe place or such open roadstead anchorage....that Charterers or their agents may direct..."*

30

Clause 8 provides, inter alia that:

*"The Captain shall prosecute his voyages with the utmost dispatch.."*

and

*"The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and agency.."*

Charterers have deducted, as damages, at the charterparty hire rate, the period referred to in paragraphs 32-37 above when the Master/Owners refused to discharge cargo at Sikka and/or failed to follow Charterers orders and directions, and failed to prosecute his voyage with utmost dispatch. in breach of Clauses 6 and 8.   The relevant period is from 1345 on 19th May 2007 to 2245 on 2nd June as appears in the Charterers' Final Hire Statement.  Charterers are entitled to deduct this sum as damages by way of equitable set off, as referred to in paragraph 45 above,   the Charterers having been deprived of  the vessel's services and/or were prejudiced in the use of the vessel.   Charterers have also deducted the bunkers for the above period.

55.  Further and/or alternatively the vessel was off hire, as provided by clause 15,  for the period referred to in paragraph 56 above.

56.  Charterers have deducted Owners expenses, as per their letter to Owners of 12th September 2007 which is attached at page 201.

57.  At Constantza and Agigea the quay tariff and basin tariff totaled E 16,272 (page  202).  The vessel was in port for 17.05 days, which results in a daily port rate of E 954.37/day.  The additional costs, as damages, that

Cosmotrade had to pay as e result of the slow loading rate was E 954.37 x 7.584 days (paragraph 44 above), or E 7,237.94, which Cosmotrade have debited as $ 9,691.60.

58. At Mumbai, the port charges were; $29,656.94 berth charges and $321.38 watchman charges (page 203). The vessel was alongside in Múmbai for 9.49 days. The port costs were therefore $ 3,158.94/day. The additional costs, as damages, that Cosmotrade had to pay as a result of the slow discharging rate was $3,158.94 x 2.9 days (paragraph 50 above), or $9,160.92, which Cosmotrade have debited in their revised Final Hire Statement.

59. The total sum deposited in escrow with Reed Smith is US$ 301,295, not including any accrued interest.

60. The Charterers seek an award from the Tribunal:

   (i)   That the Owners claims be dismissed;

   (ii)  That Charterers are entitled to US$ 446,950.05 as set out in their revised Final Hire Statement, alternatively $553,748.30 under paragraph 47 above.

   (iii) That Charterers are entitled to interest compounded at three monthly rests on the said sum at the commercial rate on US dollars from 22nd July 2007 being one month after redelivery;

   (iv)  That US$ 301,285 together with interest earned thereon be forthwith released to Charterers from the escrow account.

   (v)   That the Owners forthwith pay to the Charterers the sum by which the funds released to Charterers from escrow

32

fall short of the total sum awarded together with interest accrued thereon up to the date of payment;

(vi) That the Owners pay the costs of this arbitration, reimbursing the Charterers in respect of the Arbitrators fees and expenses if already paid by the Charterers.

(vi) That the Owners reimburse the Charterers in respect of their costs in this arbitration, to be assessed by the Tribunal if not agreed.

(vii) That Owners release from Rule B attachment, any of Charterers funds which have been seized/frozen.

We request that Charterers serve their Reply and Defence to Counterclaim Submissions within the customary 21 days.

Yours faithfully,

Transport Counsellors International Ltd

cc:    Reed Smith Richards Butler
       Beaufort House,
       15 St Botolph Street,
       London
       EC 3A 7EE

33

# EX. B

IN THE MATTER OF THE
ARBITRATION ACT 1996

AND

IN THE MATTER OF AN
ARBITRATION

B E T W E E N :

DOUBLE HAPPINESS SHIPPING
COMPANY LIMITED

Claimants

- and -

COSMOTRADE EXPORTS SA OF BVI

Respondents

MV "ALEXIA M" - C/P D 12.04.2007

---

REPLY TO DEFENCE AND
COUNTERCLAIM SUBMISSIONS

---

20th November 2007


Alan Oakley                           Clive Aston

Hoy's Farm                            Consult Marine Ltd.

Upwick Green                          30 Hobbs Court

Albury, Ware,                         2 Jacob Street

Hertfordshire SG11 2LD                London SE1 2BG

England                               England


Dear Sirs,


**<u>Re: Alexia M – c/p dd 12.4.07 / Cosmotrade Exports S.A.</u>**

We refer to the Reply and Defence to Counterclaim Submissions forwarded by
Messrs Reed Smith Richards Butler for Owners, and would be obliged if the
Tribunal would accept this letter and accompanying documents as the
Charterers', Messrs Cosmotrade Exports S.A., Reply to the Defence to
Counterclaim Submissions.

1.      We will adopt the numbering used by Reed Smith. Where a specific
        point or issue raised by Owners in their Reply Submissions has not
        been addressed in these Submissions, it should not be construed as
        Charterers having agreed or accepted such point or issue. No
        admissions are made as to any of the allegations in the Owners' Reply
        Submissions.

2.      No comment.

1

3.    Various allegations are repeated in various places in the Reply Submissions. We ask the Tribunal to note that we shall only comment on such allegations once.

3.1    The full nature of the Owners' case has only been revealed in the Reply and Defence to Counterclaim Submissions. As a general comment we note numerous instances of surmise, suspicion, innuendo, suggestions that *"facts"* are clear or obvious, and indeed references to so-called *"facts"* all without any evidence to support them. The Owners' case lacks evidence to support it. The surmises, suspicions and innuendos are just that. What is alleged to be clear or obvious is not. What is called fact lacks any evidence to support it.

3.2    Attention is also drawn to the frequent accusations of fraud leveled at the Charterers in the Reply Submissions. The burden of proof of such accusations is heavy and the finger of fraud should not lightly be pointed without solid evidence to support it. No evidence whatsoever has been produced in support of these serious accusations. If the Owners have evidence to support these allegations they should be obliged to produce the same forthwith. In the absence of such evidence the accusations should be peremptorily withdrawn.

3.3.    Charterers welcome the Owners' decision, without the need for an application to be made to the Tribunal, to attach to their Defence Submissions, the correspondence which they had previously declined to disclose on grounds that it bears the words *"without prejudice"*. We believe that this correspondence will make clear to the Tribunal the true nature of what was going on between the parties and why. The documents which have been attached in the Owner's Annexures have not been numbered clearly. We therefore refer to the documents in the

2

Owners' Annexures both by date and numerically. Also, not all of the relevant correspondence has been disclosed by Owners. We attach additional messages to these Submissions to which we refer by page number.

4      In paragraph 4 of the Reply, Owners say that *"the core issue"* in this arbitration relates to the alleged issue of clean bills of lading. We do not agree. The dispute relating to bills of lading and the Owners' refusal to deliver cargo at Sikka are subsequent disputes raised towards the end of the voyage only shortly before the ship reached India, after all the problems with the cranes at the loadport, and after the deviation to Aden had been discovered. The alleged issue of multiple clean bills of lading is a myth created by Owners. The real core issue in this case is an attempt by Owners, by accusing Charterers of fraud to justify withdrawing their services under the charter party, and thereby to oblige Charterers, against their will, to abandon their legitimate claims to damages and/or off hire in respect of the misdescribed or defective capacity of the cranes, and the deviation to Aden .

4.1    The Tribunal will recall that in respect of the disputes regarding the cranes, and the Charterers' underloading claim, on 19th May an agreement had been reached between the parties whereby US$70,000 was paid to Owners, and a sum of US$148,000 was placed in escrow. On 21st May a new dispute arose. By a message dated that day, Reed Smith entered the lists. We refer the Tribunal to page 157 attached to the Charterers Defence and Counterclaim, repeated as document 6 in Owners' Annex A.    (For ease, we will refer hereafter in these Submissions to the Charterers' Defence and Counterclaim, as "D&C").

3

4.2     It is apparent from the content of this message that the writer did not have a clear or full picture of the situation.

4.2.1   He was in ignorance of the agreement reached on 19th May for part payment of the disputed deductions from hire and part deposit in escrow of the balance.

4.2.2   He was apparently ignorant of the terms of the charter party, for he said that Owners were entitled *"to immediately withdraw the services of the vessel .... either in total or in part"*.   Partial withdrawal from charter or suspension of services is not a remedy recognized under the 1946 edition of the NYPE charter. There was no provision in this charter on which a right to suspend services could have been based.

4.2.3   He had clearly been told that Charterers had issued *"multiple sets of Bills of Lading"*.   This was not true.

4.2.4   He alleged that these non-existent multiple bills of lading had been issued *"through an agent not authorised by the Master"*.

4.2.5   He accused Charterers of having *"consistently and persistently"* failed to provide Owners with copies of these non-existent multiple bills of lading *"despite Owners' frequent requests that they do so"*.   No such *"frequent"* requests had been made. Obviously Charterers would have been unable to provide copies of non-existent bills of lading even if they had been asked to do so.  The accusation that Charterers had *"consistently and persistently"* failed to provide copies was untrue.

4.2.6   He was unaware of the agreement reached on 9th May for the ship to proceed to Sikka instead of to Kandla as first port of discharge.

4

4.2.7   The writer of this message then went on to lay down a series of demands, demands which if they were capable of being met at all, would have taken many days to perform, culminating with the demand that Charterers agree that the vessel should remain on hire throughout the period of *"inevitable delay"* while Owners demands were being satisfied.

4.3     The open message of 21st May was followed by the first *"without prejudice"* message, dated 24th May.   This is perhaps the most revealing message before the Tribunal.  It is found at document 10 of Owners' Annex A.    Under cover of this message, the Owners lawyers, Reed Smith, placed before Charterers a draft of a *"Deed of Indemnity, Waiver and Agreement"* which they insisted must be executed by all relevant parties prior to discharge taking place at Sikka or Mumbai.   The text of the *"Deed"* is found as document 1 in Annex B to the Owners' Reply Submissions.

4.4     The whole tenor of this document is oppressive and it reveals in stark colours the real *"core issue"*, namely, the Owners' concern to escape from responsibility for the breaches of charter they had committed and were still engaged in committing.

4.4.1   The contents of the draft were stated in the covering message to be *"very minimum acceptable to Owners' insurers"* and *"not open to negotiation"*.   The draft was presented on a *"take it or leave it basis"*.

4.4.2   Drafted by a lawyer, it is stated to be a *"deed"*.  A deed requires no consideration.  No doubt the drafter was concerned that there was no consideration for the proposed *"agreement"*.   Unless executed as a deed, the agreement set out in the document would be invalid or unenforceable for lack of consideration.

5

4.4.3    It is intended to be signed not only by Charterers but by the shippers of the cargo, and both the receivers of the Kandla cargo and the receivers of the Mumbai cargo, parties with whom the Charterers had no direct contractual relationship.

4.4.4    It requires the Charterer and the cargo interests to confess that clean bills of lading have been issued *"in breach of Charter"*.

4.4.5    It requires the Charterer and the cargo interests to agree that *"the Owners have reasonably refused to comply with Charterers' instructions to proceed to Sikka"*.

4.4.6    It requires the Charterer and the cargo interests to agree that the Owners *"have reasonably refused to discharge the cargo on board"*.

4.4.7    Consideration is stated to be the Owners' agreement to discharge the cargo to the Kandla receivers at Sikka and to the Mumbai receivers at Mumbai. These were obligations the Owners already had. It seems clear that the drafter realized this, and that this was not valid consideration. That, no doubt, was why the document was presented as a deed.

4.4.8    That this is so, is further shown by some of the later provisions of the document. At paragraph 1 (g) it requires the Charterer and the cargo interests *"To waive any objection the Parties might have and/or be entitled to (and not take issue) on any point of law or otherwise as to the validity of this indemnity in the circumstances and generally and not to take any steps to seek to avoid their obligations under this Deed."* Clearly the drafter was concerned not only with the lack of

6

consideration but that his counter parties might seek to set aside the document as having been procured by duress.

4.4.9    It requires the Charterer and the cargo interests *"Not to take any legal issue with Owners actions to date, including their refusal to proceed to and discharge cargo at Sikka in accordance with Charterers' instructions including (but not limited to) not seeking to deduct any hire, recover any hire or pursue any claim for damages for any breach of Charter in connection with the same."* Clearly the drafter was concerned that the Owners' refusal to proceed to and discharge at Sikka was unlawful, but the demand is not only that claims arising from this be abandoned, but also the Charterer and the cargo interests commit themselves not to take legal issue with any of the Owners actions to date. A complete *"hold harmless"* for all claims is required.

4.4.10   This is again confirmed by paragraph 2, which states *"Charterers agree to immediately pay Owners unreservedly all outstanding hire to date amounting to US$301,295 (up to 5th June 2007), such sum being paid in part from the US$148,000 held in an escrow account for the benefit of Owners and Charterers by Reed Smith Richards Butler LLP (payment out of which to Owners Charterers hereby agree) and to waive any and all alleged claims in relation to and/or connection with Charterers' initial refusal to pay such hire and/or payment of such hire under protest and/or into the above mentioned escrow account."* The Charterers' claims for ineffective or misdescribed cranes, for off hire on passage, for the secret call at Aden, and for the refusal to proceed were all to be abandoned by Charterers.

4.4.11   In addition to all the above, Paragraph 3 then requires *"Charterers agree to immediately pay Owners' legal fees incurred on this matter to date amounting to US$ 20,000"*. Even if they had been entitled to

7

demand payment of legal fees (which is denied), given that Reed Smith had only appeared on the scene 3 days earlier, the sum claimed appeared totally unreasonable.

4.5    By refusing to render the services they had contracted to render, by refusing to comply with the Charterers' orders, by suspending communication between ship and charterers, by holding the cargo to ransom, Owners were trying to force the Charterer into absolving them from the breaches they had already committed and those still on-going, to oblige the Charterer to pay hire without deduction, and not to make any claim for refund against the Owners. It was an attempt to obtain an illegitimate advantage by commercial duress.

4.6    Unfortunately for the Owners, the Charterers did not immediately cave in and sign the non-negotiable deed as demanded.

4.7    Perhaps the best statement of the Charterers' position is to be found in their message of 29th May in the second part of document No.15 in Annex A of Owners' Reply Submissions.   We quote that message in full:

*Re:m/v "Alexia M"*

*Further to correspondence exchanged the past couple of days we would like to remind Owners that although Charterers are doing their utmost and have proposed (since 16/05/07) any and all available options to Owners so as to find an interim measure/avoid any prolonged delays and damages, Owners have simply shown a totally uncooperative and non constructive attitude towards resolution of this matter.  On the contrary, Owners only proposed solution to this issue*

8

*is total capitulation from Charterers. As advised, we see Owners proposed agreement terms as nothing more than duress.*

*We remind Owners following:*

i)   *Following Owners refusal to follow Chtarterers legitimate orders it was Charterers who invited Owners to a meeting, in order to discuss disputes.*

ii)  *Following that meeting, Charterers agreed to remit, under reserve, to Owner's bank account USD 70,000 and to place in an escrow account, held by Owner's lawyers, the amount of USD 148,000, subject to the vessel discharging.*

iii) *Despite the payment as above, Owners have continued to decline Charterers instructions. Charterers pointed out to Owners that Owners decision to stop the ship results in the ship being off hire, and that further, Charterers instructions are legitimate. Owners do not accept this and Charterers accordingly proposed immediate arbitration to be arranged to address this. Owners have not accepted this proposal.*

iv)  *Charterers, by way of mitigation, obtained from shippers/sub-Charterers, Messrs Mittal, confirmation as requested by Owners as to the receivers of cargo that was originally destined for Kandla and that is now to be discharged at Sikka.*

v)   *Charterers agreed to provide Owners, if they wished, with an indemnity signed by them and shippers/sub-Charterers holding them fully harmless of any and all claims of whatsoever nature*

*arising out of the fact that cargo that was to be discharged at Kandla is to be discharged at Sikka.*

*Charterers, despite Owners wrongful position on this matter, have bent over backwards to try and seek a resolution and, aside from Owner's unacceptable attempts at duress, have endeavoured to meet Owners perceived concerns.*

*On the other hand Owner's totally unreasonable attitude and in breach of their c/p obligations is more than well evidenced from the following, which we would also like to remind Owners:*

*a)   Since 12/05/07 Master has shut off his communication systems/stop sending noon reports and in general Owners had acted as if they have partially withdrawn vessel from Charterer's service, which, we have pointed out, they are not entitled to do.*

*b)   Master made an unauthorized call at Aden, for which up to this day Owners have failed to provide Charterers with requested information.*

*c)   Despite the fact that Charterers live up to the agreement reached for the USD70,000 to be paid, under reserve, to Owners and for the USD 148,000 to be placed into escrow account, the Owners have failed to move the ship from Kandla.*

*d)   Owners have provided Charterers with an ultimatum that failure of indemnity strictly in terms proposed by them, to be*

*signed      byCharterers/sub-Charterers/shippers/receivers,
vessel shall remain idle.*

e)    *Owners sent most of their messages outside normal office
hours, despite the urgency of this matter, but also keep
alleging facts that are totally unsupported and groundless
and therefore by no means assist in finding a solution to this
matter.*

*Charterers repeat herewith that, should Owners wish, they
can arrange for the indemnity proposed by Charterers, to be
signed by Shippers/Charterers/sub-Charterers.*

*Also, Charterers, should Owners wish, and under reserve,
are willing to do their utmost in order to try to convince
receivers for cargo to be discharged at Kandla, where it
was originally destined to.*

*What cannot continue is Owners sitting off Kandla holding
the cargo to ransom.*

*If Owners are not satisfied with the form of indemnity
proposed by Charterers then why don't Owners mitigate and
discharge the cargo into bonded custody as they said they
would?  Sitting off Kandla is neither a solution, nor
mitigation, nor is it a remedy under the c/p.*

*If Owners continue with their conduct of failing to follow
Charterers legitimate instructions, then Charterers will
have to consider whether to accept Owners' continuing*

11

> *conduct as repudiatory thereby bringing the fixture to and*
> *end.*
>
> *Best Regards*
> *Nikoletta Tsala/Ins. & Claims Dept.*

4.8    As may be seen from this message, the Charterers tried very hard to meet the Owners concerns. They invited Owners to meet. They made a payment to Owners. They paid money to escrow. Charterers offered to have the issues then in dispute submitted to immediate arbitration. When Owners threatened to contact the shippers, Charterers supplied them with the shippers' name and coordinates.    They obtained confirmation from the shippers that the Kandla cargo was to go to Sikka. They offered to indemnify Owners.   They offered to get the shippers to join in an indemnity.

4.9    Confronted by the draft deed of indemnity sent to them by the Owners' lawyers, the Charterers revised the text into a form acceptable to them.  The message, dated 25th May 2007, which was omitted from the Owners' Annex A, is attached hereafter at pages 48 – 51.

4.10   Finally, after 14 days of argument, the Owners agreed to accept a watered down version of the deed of indemnity.  The new version, stripped of the admissions, confessions and concessions of the first draft, was signed on 1st June.  A copy is found at page 181 attached to the Charterers D&C as document No.2 in Annex B to the Owners' Reply.    Further money was paid into escrow to secure the Owners' claims for hire, and the vessel proceeded to Sikka to discharge.

4.11   Paragraph 4 of the Owners' Reply Submissions contains a number of allegations of so-called fact which Charterers answer as follows.

Owners say:

4.11.1    That Charterers had issued clean bills of lading, ignoring the comments in the mates' receipts.
Answer:    there is no evidence to support this allegation, which is denied.

4.11.2    That Charterers had issued multiple bills of lading.
Answer:    there is no evidence to support this allegation, which is denied.

4.11.3    That Charterers had issued bills of lading through unauthorized agents.
Answer:    Nothing in the charter party restricts in any way the Charterers' choice of agent to sign bills of lading.    If it is contended that the Master's letter (page 93 attached to Charterers D&C) restricted authority to sign to Aries Shipping, then the purported restriction was contrary to the terms of the charter party.  The Master was not entitled to place such a restriction.

4.11.4    That Charterers failed to supply Owners with copies of original bills issued for Kandla and Mumbai.
Answer: absent Owners' approval of the draft bills of lading none had been  issued.

4.11.5    That the Owners were left with little choice but to insist on delayed discharge.
Answer:    The Owners were not compelled by anyone to wait somewhere off the coast of India.  They had choices.    They had already accepted Letters of Indemnity from Charterers in reliance on which they could have gone in to discharge.    Their own P & I Club

recommended them to proceed to discharge the cargo under lien. We refer the Tribunal to Document 13 in Annex A of the Owners' Reply. They could have discharged the cargo relying on the indemnity implied by law when following Charterers' instructions. The Owners chose not to do any of these things because it did not fit with the course of action to which they had committed themselves.

5      Many of the allegations of so-called fact are repeated in paragraph 5 of the Points of Reply. These allegations have already been answered at paragraph 4 above.

5.1    In addition to the allegations addressed in Paragraph 4, it is alleged that *"bills of lading were issued by an unauthorized third party, namely Sea Pearl Shipping Co Limited"*.

Answer: The Owners' case appears to be that the Master by a letter of authorization (referred to above), did not authorize Sea Pearl to sign. As pointed out in the D&C at paragraph 22, the Master's letter was itself not in compliance with the terms of the charter party. Neither the Master nor the Owners had the right to restrict the Charterers' choice of agent to sign the bills of lading.

6      On the evening of 18th May, the Charterers sent to Owners amended draft bills of lading, same are attached at pages 52 to 64. As admitted in paragraph 6 of the Owners' Reply, these documents were stamped *"Draft"* and were unsigned. These documents were not represented to be copies of original bills of lading. They were what they appeared to be: unsigned drafts submitted to Owners in accordance with clause 92 of the charter party. It appears the Owners were not able to

distinguish a draft bill of lading, stamped "*draft*" and unsigned, from an actual bill of lading.

6.1    The reference in paragraph 6 of Owners' Submissions, to the Master's letter and the allegation that the proposed signatory of the bills, Sea Pearl Shipping Co. Ltd. was not authorized to sign, has already been dealt with at paragraph 5 above.

7    In paragraph 7 of the Owners' Reply, it is stated that Charterers decision to change the first discharge port from Kandla to Sikka was made after 19th May. This is not true. As set out in paragraph 29 of the D&C, and as evidenced by the documents there referred to, the change of destination from Kandla to Sikka was the subject of an agreement between the parties made much earlier, on 9th May. It was not, as suggested in the Owners' Reply, something which Charterers unilaterally sought to impose on Owners after 19th May. The Charterers "*demands*" only arose after the Owners had reneged on their agreement and had declared they would not go to Sikka after all.

7.1    It is further stated that the Owners "*tried to obtain necessary assurances and indemnities in respect of both discharge* [at Sikka] *and against non-production of original bills of lading and discharge at a port other than the port listed in the copies of bills*".

Answer: Indemnities in the usual P & I approved form had been supplied to, and accepted by the Owners, on 9th May. What the Owners were in reality seeking, witness the draft Deed of Indemnity placed before Charterers in 24th May, was a complete "*whitewash*" in respect of all claims whatsoever and howsoever arising under the charter. Owners attention had been drawn to the indemnity implied by law where an Owner or Master follows Charterers instructions. An

15

additional letter of indemnity had been offered. Charterers had offered to get the shipper, Mittal, to join in signing an indemnity. What Charterers were not prepared to do was to accede to the overbearing text which Owners through their lawyers were demanding.

8      Paragraph 8 opens with the allegation that the shippers, Mittal, applied pressure on Charterers to cooperate.

Answer: There was no such pressure.

8.1    It is then stated that the Owners ultimately secured the necessary indemnities and assurances from the shippers and from the Charterers.

Answer: The indemnity given on 1st June (page 181 attached to the D&C and document No.2 at Annex B to the Owners' Reply) was a pale, emasculated version of what Owners had first demanded. It gives the Owners little more than they would have had under the letters of indemnity given on 9th May. It gives no more that the Owners would have been entitled to by operation of law under the charter party. Such an indemnity had been offered to Owners on 25th May – we refer the Tribunal in this respect to the documents attached hereafter at pages 48 – 51.

8.2    It is alleged that after the revised deed had been signed, Charterers showed a *"third set"* of bills of lading to the Owners. It is further alleged that these bills of lading were fraudulent and that clean bills of lading remained in circulation.

Answer: the first and second sets of bills of lading described in paragraph 6 of the Points of Reply were by Owners' own admission not originals, but drafts submitted to them for approval, which

approval was never forthcoming.   There is no evidence that a first or second set of bills had been issued or placed in circulation.   There is no evidence that clean bills had been issued or placed in circulation. There is no evidence that multiple sets of bills of lading had been placed in circulation. On the contrary, the copies of the original bills of lading submitted to Owners together with the signed indemnity on 1st June were accompanied by a declaration from Mittal assuring them that there were no other bills of lading in circulation.  Same is attached hereafter at pages 65 – 86 hereafter.

8.3     We draw to the attention of the Tribunal that although in the Owners Reply, notwithstanding that according to Owners *"It was and is patently obvious to Claimants that this third set of Kandla/Sikka cargo bills was/is also fraudulent and that the real clean bills of lading remained in circulation."* nonetheless the Owners chose to discharge the cargo at Sikka.   The Mumbai bills of lading are also described by Owners as being *"patently fraudulent bills"* but nevertheless Owners chose to discharge the Mumbai cargo against those bills.

8.4     The Owners say they chose to do this relying on the Indemnity they had obtained.   But as stated above this Indemnity added little or nothing to what they had had in hand since 9th May.   It added nothing to the indemnity which would have been implied at law.

9       Paragraph 9 contains the statement that the alleged unlawful issue and the alleged refusal to provide copies of bills of lading has directly caused the delays to the vessel and any losses suffered by Charterers as a consequence.

        Answer: There is no evidence of the unlawful issue of bills of lading as alleged or at all.  But even if there were such evidence, the unlawful

issue of bills of lading would not have been the direct cause, or indeed any cause, of the delay to the vessel.    The Owners could have proceeded to the discharge port and discharged the cargo pending proof of title.    They could have proceeded relying on the indemnities already given on 9th May.    They could have followed Charterers instructions relying on the indemnity implied at law.    The Owners were advised by their own P & I Club to discharge the cargo under lien.    The Owners' decision to delay the vessel was motivated by a desire to force the Charterers into waiving all claims arising under the charter as set out in the draft deed presented to Charterers on 24th May, as referred to in detail above.    It was the Owners' choice which caused the delay.

9.1    It is further stated that the Charterers *"have obviously agreed to issue clean bills of lading pursuant to the terms of their contract of carriage with shippers"*.

Answer: This allegation is neither obvious nor a fact.    Reference to the contract between Cosmotrade and the shippers, attached at page 87 reveals that the inference Owners seek to draw is false.

9.2    Finally it is stated that Charterers *"have sought ... to resist Claimants' legitimate demands and have therefore caused the present dispute."*

Answer: As we have demonstrated above the Owners' demands were far from legitimate.    The Charterers had every right to resist such unlawful demands.    It was the Owners' attempt to exercise duress which brought about the delays to the vessel.

10    A copy of the contract with the shippers, Mittal, is attached at page 87.

10.1    Copies of the original, accomplished bills of lading for the Sikka cargo are attached at pages 88 to 99. The originals are at Owners' disposal. Also attached, at page 100 is a letter from Aries, authorizing Sea Pearl to sign.

10.2    The Charterers do not know whether or not letters of credit or banks were involved and if they were, Charterers have no relation, contractual or otherwise, which would enable them to obtain the kind of document referred to in paragraph 10(b) of Owners' Reply.

10.3    A declaration of the kind referred to in paragraph 10(c) was given to Owners together with the Indemnity. We refer the Tribunal to page 71 hereafter.

11.     The damages claims that Charterers advanced in May earlier this year, were set out in detail in Charterers' message attached to their hire statement of 4th May 2007. The Owners suggest that no reason has been given for the deductions -- yet the Charterers message attached at page 136 to 137 of the Charterers D&C set out the reasoning for the claims. For the assistance of the Tribunal that message is attached again hereafter at pages 101 to 102.

11.1    Owners have headed paragraphs 11-13 as "*non payment of hire*". This is incorrect. As set out above, and as per the Charterers' message of 4th May 2007, the deductions are claims in damages. The Charterers' right to make such deductions by way of equitable set off has already been addressed in paragraph 45 of the Charterers Submissions of 24th September 2007. Charterers have also advanced their claim in arbitration in the further and/or alternative as an off-hire claim.

11.2    The Owners have referred to deductions of $ 70,000 and $ 217,391.67. As explained in the Charterers' Submissions, the $ 70,000 deduction for the shortloading claim was repaid in full. This issue has been closed. As regards the *"$ 217,391.67"* the Tribunal will see from the Charterers May 2007 hire statement at page 134 of the Charterers D&C, that the deduction made was $ 177,276.35 damages ,$ 14,900 Owners' expenses and $ 26,032.61 off-hire. So far as the off-hire at 1.5 days is concerned the Owners had accepted this deduction throughout the fixture, albeit "without prejudice" but they retracted same upon serving Claim Submissions presumably to try and bring themselves within the *"undisputed"* reference to off-hire in the charterparty.

12.    Owners have referred to the charterparty reference of *"undisputed off hire"*. However as set out in paragraph 11 above the Charterers' position is that their claims have been in damages. Owners now attempt to lump *"off-hire/damages"* within the meaning of *"undisputed hire"* under Clause 77. Clause 77 clearly refers to off-hire, not damages for breach. It was not the intention of the parties to deprive the Charterers of their lawful right to make deductions for damages by way of equitable set off. Had the parties intended that then there would have been a reference in the charterparty preventing the Charterers from making such deduction. No such clause appears. The Owners can not misconstrue the charterparty simply to suit their position. Charterers are entitled to make claims in damages.

13.    The Charterers have long since reimbursed the $ 70,000 deduction for short loading. As above, this matter is dead and does not merit further discussion.

13.1    No hire has unlawfully been deducted, or deducted in breach of charter. There is no case for a Preliminary Order for payment of any sums to Owners.

14.    Under paragraph 14, the Owners put the Charterers to strict proof of the events listed in Paragraph 4 of the D&C. We do not believe that it is necessary to trouble the Tribunal by going through each and every event listed, particularly as nearly all items are referred to in the documents attached to the D&C Submissions, such as the Statements of Facts, and messages, and/or are referred to in the log books, the originals of which the Owners have.

15.    Paragraph 5 was set out for the assistance of the Tribunal. Charterers were not trying to make a *"case"* as Owners suggest. Neither was paragraph 5 limited to issues relating to the cranes, as Owners infer. Only 3 of the 24 sub-paragraphs dealt with the cranes. Each sub-paragraph, where appropriate, was subsequently addressed in detail in the Submissions that followed. Far from being a *"litany of irrelevant, incorrect and unsufficiently particularized allegations"*, most of the sections are actually matters of fact. While Owners claim that the list is *"irrelevant, incorrect"* they have failed to identify which items, in their view, are irrelevant and/or which are incorrect.

16.    The Owners have suggested that Charterers have *"ignored"* what they term as a *"tolerance"* applicable to the safe working load of the crane. The Owners refer to the *"about"* reference at the foot of the ship's description. Owners give no indication of what *"tolerance"* they believe should be applied in this respect.

16.1    Charterers submit that there is no implied tolerance on the safe working limit of the crane. The SWL is ascribed to the crane by her

Classification Society. It does not change unless the Classification Society changes it. When a crane is ascribed its SWL it is tested to 25% over the lifting capacity. So for a crane with 16 tonne lifting capacity it would be tested to 20 tonnes. While Charterers accept that certain items in the ship's description (such as speed and consumption) would be subject of a tolerance for the word *"about"*, Charterers' submit that it would not apply to items such as the number of holds, or to items which have been assigned by an authority, such as the drafts, or the crane's SWL.

16.2    The ship was chartered with cranes warranted as being capable of lifting 16 tonnes and Charterers are entitled to expect cranes capable of lifting 16 tonnes, and no less.

16.3    Owners say that the weights of the steel plates have been mis-stated on the packing lists. This is denied. The weights on the packing lists for the steel plates loaded at Agigea were correct. Indeed, the Owners' own evidence goes a long way to confirming the Charterers' position as we will address later. It is most certainly not correct, as Owners suggest, that it has *"been accepted by all parties that the weights of the steel plates as set out in Respondents packing list have been misstated"*. The packing list weights for the steel plates, being the weights referred to and relied on by the stevedores, and surveyors in their load port tests, were correct. We attach at page 103 an explanation from the Shippers, Mittal about the way in which the plate weights are obtained. The Tribunal will see that Mittal state:

> *"...the packing lists we produce show the weights and dimensions of the plates and that same are absolutely accurate. Both the weights and dimensions are computer controlled/generated and the details are marked on each plate."*

22

16.4    The tests on the cranes at Constantza were not based on incorrect unit weights of individual plates and there is no question of the SWLs of the cranes ever having been exceeded at any time during the currency of the fixture.  On the contrary, the cranes were quite incapable of achieving the designated safe working loads.  We will address the weights issue in more detail later herebelow.

16.5    Further, the crane employed by Mittal at their factory in Galatz to load the bundles of plates into the barges has a weight lifting limit of 15 tonnes. There were no bundles of cargo destined for the Alexia M which exceed 15 tonnes.  The 16 tonne SWL of Alexia M was never exceeded at Agigea  because no bundle of cargo exceeded 15 tonnes. We refer the Tribunal to the declaration from Mittal attached at page 104 which states:

> "*We hereby state that the loading of steel plates from the steel mill to barges at Galatz was conducted by using shore cranes having a maximum lifting capacity of 15 mt.*"

17.    In paragraph 17 of the Reply Submissions the Owners attempt to distance themselves from the Master's instructions not to load more than 10 metric tonnes or 2 steel plates.  The Owners adopt this position by suggesting that the Master misunderstood that the majority of steel plates would not be more that 5 tons per unit.  Owners go on to state that the weight of the plates vary from approximately 5 tonnes to 11 tonnes.  It is correct that the plates weighed different figures, but those quoted by Owners are wrong.

17.1    Rather than trouble the Tribunal with having to go through the detailed packing lists, a task which Owners appear not to have done, despite

their making statements referring to the packing lists, we can advise the Tribunal as follows:

17.1.1   The lists attached at pages 43-79 of the C&D Submissions, show that 2821 plates were loaded at Agigea.

17.1.2   From the 2821 plates loaded;

| | |
|---|---|
| 2130 | weighed 4.967 tonnes or less (under 5 tonnes) |
| 493 | weighed 5.947 tonnes (under 6 tonnes) |
| 17 | weighed between 6 and 7 tonnes |
| 181 | weighed over 7 tonnes |

17.1.3   So the breakdown in percentage terms of the steel plates loaded at Agigea was;

| | |
|---|---|
| 75.5% | less that 5 tonnes |
| 17.5% | over 5 tonnes but less that 6 tonnes |
| 0.5% | between 6 and 7 tonnes |
| 6.5% | over 7 tonnes |

17.1.4   Over three quarters of the cargo loaded at Agigea was under 5 tonnes. 93% of the cargo loaded at Agigea was under 6 tonnes. Just 6.5% of the cargo was over 7 tonnes.

17.1.5   The plates at Agigea weighed between 1.963 tonnes at 11.039 tonnes.

17.2     Owners have referred to the Break Bulk Survey report at Constantza. The have suggested that the surveyors use the "*reported*" weights as opposed to what Owners refer to as the "*actual*" weights. In fact Breakbulk have used the correct – actual – weights of the sheets per the packing list. We refer the Tribunal to the photograph at page 4 of the breakbulk report (page 86 of the D&C Submissions). For ease of

24

reference same is attached hereafter at page 105. The dimensions and the weight is given in the line;

15.67 x 3263 x 12375     4967

This has been highlighted on the photograph. The weight is the number 4967 or 4.967 tonnes. If the tribunal refers to the packing list (a copy is attached for ease of reference at page 106) they will see the various sheets weighing 4.967 tonnes list as;

15.67     3263     12375.0     4,967

which is exactly as appears in the photograph of the sheet that was used to weigh the cargo. We also refer the Tribunal to the explanation given by the Shippers as to how the plate weights and dimensions are obtained, as set out in paragraph 16.3 above.

17.2.1   The weight of sheets used to test the crane at Constantza were 4.967 tonnes each. Three sheets, together with the lifting beam weighed 15,859 tonnes but the crane was unable to lift this weight.

18.      In paragraph 18 the Owners have misconstrued the message from Charterers to the Master where the Charterers refer to the need for dunnage between the sheets that weighed over 7 tonnes. As set out in paragraph 17.1.3 above, this cargo accounted for just 6.5% of the plates loaded at Agigea. The request was perfectly logical. The Charterers did not want the cranes overloaded. With weights in excess of 7 tonnes and up to 11 tons, together with the weight of the lifting beam, the 16 tonne SWL could have been exceeded if 2 such plates had been loaded. Therefore the Charterers restricted the loading of cargo over 7 tons to 1 plate at a time. The plates weighing over 7

tonnes were not bundled up into 2 or 3.   However this makes no difference to the Charterers' case that with the Master's restriction on loading, the 75% of cargo under 5 tons that had been bundled up, and the 17.5% of cargo under 6 tonnes that had also been bundled accordingly, could not be loaded, bundled up as prepared, due to the Master's limitation on the crane's lifting ability.

18.1     We point out to the Tribunal that Owners further misconstrue what has been stated in the Charterers Submissions.  Owners suggest that all the plates were bundled up in bundles of 3.  The submissions however stated that the plates were bundled up according to the SWL of the ship's cranes.  That would be 3 plates less than 5 tonnes and 2 plates less than 7 tonnes.

18.2     Owners claim that the "*lighter plates*" weighed more than 5 tónnes.  In fact the lightest plates weighed just 1,963 tonnes.  If the Owners are referring to the plates of 4,967 tonnes weight than it is not true that they weighed more than 5 tonnes.  In addition to the explanation in paragraph 17.2 above, we will address this in greater detail later herebelow.

18.3     Owners have referred to what they call "*joint statements*" at their Annex E which are not "*joint statements*", rather they are declarations prepared by the Master for which Messrs Romtrans have signed "*only for received*".  It is denied that the agent, or stevedores attended any claimed weight test of the Master.  We attach hereafter at page 107 a declaration from Romtrans that they did not attend any of the tests that the Master claims to have conducted.  Further, the Master had attended the survey with Messrs Break Bulk, earlier during loading, yet the Master chose not to call the Charterers' surveyors to the tests which he claims to have undertaken.  The tests make no reference to the identity

of the weights or plates that the Master claims to have lifted, so the Charterers have no way of now verifying the figures that the Master claims to have lifted. Notwithstanding, even on the basis of the Master's own tests the cranes were still incapable of lifting the warranted 16 tonnes and could only lift a lesser figure of 12 tonnes or 13 tonnes, according to the Master.

19.    The Owners refer to unilateral tests they conducted in Mumbai. The Owners suggest that *"Charterers declined to attend such tests"*. Nothing could be further from the truth. The Charterers made every effort to join survey with the Charterers at Mumbai, but the Owners refused access to the Charterers. Indeed the messages which Owners have attached to their Reply Submissions state the position very clearly. We refer in particular to the Charterers' protest of 19th June 2007 to Owners about their unilateral weight test (message D5 of the Reply Submissions) which states, inter alia;

*Re: m/v "Alexia M", c/p dd 12/04/07*

*We refer to Owner's earlier message in relation to alleged survey that was unilaterally arranged by Owners, in order to verify weight of steel plates, contents of which are totally rejected.*

*At this point we would like to put on record circumstances surrounding Owner's request for a joint survey:*

*i)    On 14/06/07 Charterers agreed to Owner's request for a joint survey to be carried out in order to verify weight of steel plates.*

27

ii)  *On the same date (14/06/07) Charterer's attending surveyor and vessel's agents were immediately alerted, by Charterers, so as to be available should Owners make necessary arrangements.*

iii)  *Since that day we have sent further chasers to Owners/vessel's agents and Club's correspondents requesting developments.*

iv)  *Owners not only failed to make any arrangements whatsoever in this respect but also never gave any instructions to Master for a joint survey to be conducted.*

*It is clearly evidenced that despite Owner's initial request for weighing of steel plates to be jointly made they conducted same unilaterally and therefore findings are by no means acceptable.*

The Charterers agreed to a joint weight test and waited confirmation from Owners. However, the Owners went ahead and conducted the test unilaterally, and subsequently denied Charterers the opportunity of making any test on board.

19.1  Owners claim that the weight of the cargo exceeded the "Bill of Lading (packing list) weights". It is not admitted that the total cargo loaded (being pipes, steel plates, steel sheets, and machinery) exceeded the packing list or bill of lading weight by 1,200 tonnes. If additional cargo in excess of the bill of lading quantity were loaded, which is not admitted, that does not mean that the weights of the individual plates on the packing list were wrong. On the contrary, the Charterers maintain that the individual weights were all correct, and as set out below, the Owners' own unilateral tests show little variance in weight (some fractionally lighter, some fractionally heavier) from the

packing list weights.   Further, the Shippers, Mittal have explained that the plate weights are accurate, as set out in paragraph 16 above.

19.2     While the tests that Owners undertook on the weights of the cargo were unilateral, indeed the Owners excluded the Charterers from such tests, we draw to the attention of the Tribunal the following:

19.2.1   The Dhiraj report at page 3 of Annex F of Owners Reply refers to a weight test carried out by Messrs "Cargo Gear Services".   The test is attached at D1 of Annex F.   For ease of reference we have attached copies hereafter at pages 108 and 109 respectively.   Messrs Dhiraj refer to weight test results in plate weights ranging from 4.360 tonnes to 5.955 tonnes.   They state that the Master reports that he was told by the Shipper (that would be Messrs Mittal) that the "*weight of each plate to be 4.5 tonnes*".   This simply does not make sense. The Shippers did not speak to the Master.   There is no reason that Mittal would make such a statement given that no plates loaded were 4.5 tonnes. It is denied that anyone at the loadport advised the Master that the plates weighed 4.5 tonnes. Furthermore, the plates that Owners weighed in Mumbai were different weights and different sizes. The surveyor says that "*the weight was not mentioned on the plate*".   It was.   We have highlighted same on the page of the report attached hereafter at page 110.   The weight of the plate referred to in the report was "*4967*", or 4.967 tonnes. This is the same as found in the Constantza survey. If Owners had invited the Charterers to the survey, as Charterers had requested, then they could have explained this to the Owners surveyor.   They could have also pointed out that the plates that Owners were weighing were of 3 different sizes and weights. However, Owners denied Charterers the opportunity to attend the weight survey.

29

19.2.2   The Owners' surveyor produced results of plate weights of 5.995, 4.360, 5.920, 5.937, 5.017, 5.017 and 5.955 tonnes.  As mentioned above, there were 3 sizes weighed.  This is clear from the dimensions stated.  They were either 15.67 x 3263, 18.82 x 3253 or 17.04 x 3259. (We comment that Charterers surveyor has the figure "3263" wrong in plate I.  It should be 18.82 x 3253.  There were no plates of dimensions 18.82 x 3263).  Referring to the packing list the weights of plates 15.67 x 3263, 18.82 x 3253 and 17.04 x 3259 were 4.967 tonnes, 5.947 tonnes and 5.395 tonnes respectively.  We will tabulate the Owners' findings against the packing lists;

| Plate No. | Dim. | Packing | Owners | Diff |
|---|---|---|---|---|
| I | 18.82 | 5.947 | 5.955 | 0.048 + |
| II a) | 15.67 | 4.967 | 4.360 | 0.607 - |
| II b) | 18.82 | 5.947 | 5.920 | 0.027 - |
| III a) | 18.82 | 5.947 | 5.937 | 0.010 - |
| III b) | 15.67 | 4.967 | 5.017 | 0.050 + |
| III c) | 15.67 | 4.967 | 5.017 * | 0.155 + |
| III d) | 18.82 | 5.955 | 5.955 | 0.080 + |

*   the surveyor has used the wrong data, see below.


The Tribunal will see that for the 18.82 x 3263 plates, 2 were found to be slightly less (0.027t and 0.010t) then the packing list, ánd 1 (at 0.048t) slightly more.  For the 15.67 x 3263 plates the Owners have produced one weight slightly in excess of the packing list (plate III b) at + 0.05 tonnes.  Plate II a) is 0.607 tonnes less than the packing list. Unless the Owners are now claiming that the weight of such plates was considerably less than the packing list, then we presume that this is not correct and that a 4.967 tonnes and a lighter plate were weighed together.  Again, if Charterers had been present at the time, this

discrepancy, and the other referred to above, could have been avoided or clarified on the spot. As regards plate III c the surveyor has produced the wrong result. This plate, as can be seen from the "Cargo Gear Services" report measured 17.04 x 3259 x 12375. From the packing list these plates weighed 5.395 tonnes.

19.2.3    We draw the Tribunal's attention to the point that 3 different loading beams were used in the weight test; 1.950 tonnes, 2.060 tonnes and 1.730 tonnes respectively. These figures are then subtracted from the recorded weight to give the total weight lifted. There is no reference to the weight of the beam being weight tested. Neither is there any description of the overall process other than the reference to the weight of the beam and cargo. There is no reference to calibration, or weighing equipment used. Again, if Charterers had been present these issues could have been addressed at the time, on the spot.

19.2.4    From the 7 sets of plates tested by Owners in Mumbai, leaving aside the erroneous (much lighter) result of plates III b), the Tribunal will see that the Owners only weighed one set of plates – which were subject of the Constantza load test – of 4.967 tonnes per the packing list.

19.3     All that can be concluded from the report is that;

-    Three different sizes of plates were weighed.
-    Owners' surveyor seemed to be under the misapprehension that only one weight of plate was being weighed.
-    Three different weights of plates were weighed.
-    The weights were marked on the plates but the Owners' surveyor was unaware of this.

31

- The Owners surveyor has referred to markings on only 1 of the 3 different types of plates weighed.

- Three different weights of loading beam were used in the tests and there is no reference to whether the beams themselves were individually weighed.

- There is no reference to calibration of the equipment used, or indeed the equipment used.

- The results are inconsistent and it appears in one case that dissimilar plates may have been weighed at the same time.

- Leaving aside the erroneous result for plate II a), only 1 from the 7 sets of plates that Owners weighed was the same size and weight as the plates tested in Constantza, and that produced a result (subject to the points listed above) of just 0.050 tonnes more than the packing list weight.

- several of the Owners weight results showed the plates to be lighter than the packing list weights.

- The results can not be regarded as being conclusive of anything.

19.4   The Mumbai testing by Owners does not show that the plates loaded at Agigea were heavier than the detailed weights provided in the packing list.

20.    Owners suggest that the attendance of their engineer, stoppages of the ship, and the secret call at Aden are "*unparticularised allegation and innuendo*". The Owners do not deny the attendance of a technician, while the stoppages and deviations are matters of fact. The Charterers were not "*trying to make a point*" they were setting down the history for the assistance of the Tribunal.

20.1   Charterers do not accept that it is inevitable that ships should stop at sea to rectify "*certain minor problems*" (not that in the current case the

stoppages are accepted as being *"minor"*).  Ships should not have to stop at sea if they are properly maintained.

20.2    It is simply not true, as Owners claim, that the Aden call was never hidden from Charterers.  It was.  The log books were changed and/or incorrectly entered, the Master stopped reporting his position, neither the Master or Owners  made any notification of the call either before, during, or immediately after departure.   It was only when the Charterers subsequently found out about the call, after the vessel had already been to Aden, and put it to the Owners, that the Owners' finally owned up.  The fact that the logs record the ship steaming throughout shows that attempts were made to deceive the Charterers that the ship was steaming and earning hire, when she was in fact off-hire in a port.

20.3    Owners attempt to make light of the highly unusual issue of the vessel taking so much water in Aden, particularly as she was only a few days away from the discharge port, and given that the vessel had already taken fresh water at the loadport.  Charterers reserve the right to refer back to this issue following disclosure.

21      The correspondence between the parties supports in every detail the account of events set out at paragraphs 5(i) to 5(q) of the D&C.

21.1    What Owners' lawyers castigate as *"Respondent's self-serving and blatantly transparent misrepresentation of events"* is based soundly on the documentary evidence. If the Charterers' account differs in certain respects from the version put forward by the Owners,  this is because the Charterers' account is supported by the evidence, whereas the Owners' is not.

33

22      At paragraph 22 the Owners set out an account of what they say happened at and immediately after the meeting on 17th May. It is far from clear what they are trying to say. Are they saying no agreement was reached as a result of the meeting? They acknowledge that US$70,000 was paid to Owners and US$148,000 was deposited in escrow with Reed Smith. If there was no agreement on what basis did Charterers pay and deposit these monies? A reference to pages 160 to 164 attached to the Charterers D&C shows that an agreement was made as a consequence of the meeting. Indeed at paragraph 39 of the Owners' Reply, the Owners admit that an agreement was reached to pay monies to escrow.

22.1    At the meeting the Owners requested sight of the reverse side of the draft bills of lading submitted to them on 4th May. Those draft bills of lading had been prepared on a liner form but were clearly marked "*FIOS*". In response to Owners' request, on 18th May, in error, the Charterers submitted the reverse side of a Congenbill to Owners. The Owners drew Charterers attention to the fact that the reverse side submitted did not match the front of the drafts sent on 4th May. The Owners objected to the issue of what they described as a liner bill of lading, notwithstanding that it was clearly stamped "*FIOS*".

22.2    It was in these circumstances that the Charterers prepared what they referred to as an "*amended*" set of draft bills of lading on the Congenbill form. These are the draft bills sent to Owners on 19th May referred to in paragraph 6 above.

22.3    What the Owners appear to be saying at paragraph 22(e) and (d) is that by sending this set of amended draft bills to the Owners, Charterers were somehow acknowledging that they had issued multiple sets of

bills of lading for the cargo.  This is simply not true.  There was no evidence on 19th May to support such a belief, and there is none now.

22.4    Finally, it was at the meeting of 17th May 2007 that Charterers revealed to the Owners that they knew of the deviation to Aden.

23.    Owners deny that the logs have been incorrectly completed, but the Tribunal will see from the Charterers' D&C Submissions that the logs show the ship steaming at sea and being in port at the same time.  Not only have the logs been incorrectly completed they appear to have been originally written to deceive the Charterers, and then subsequently amended.  This is an issue that goes deeper than *"accurately completing the vessel's books and records"*.

24.    Following redelivery the vessel did subsequently arrive in China, on about 17th August for drydocking and extensive works notwithstanding that she made an intermediate laden voyage en-route to China.  Charterers do not accept the logic advanced by Owners that it is prudent to take a vessel out of service for a very considerable length of time in an *"exceptionally high market"*.  Most prudent Owners would keep their vessel's in employment during such a high market and specifically minimize any down time, particularly as no one can predict how long such a market will last.

25.    Owners suggest that they have *"comprehensively dealt"* with paragraphs 7 to 21 of the Charterers Defence Submissions, in their reply Submissions.  We remind the Tribunal that paragraphs 7 to 21 dealt with the events at loading at Agigea/Constantza.  There is nothing in the preceding paragraphs of the Owners Reply Submissions which comprehensively deals with the loading of the Vessel at Agigea/Constantza.  Neither has it been *"proven"* that the weights of

35

steel plates did not match their stated packing weights. On the contrary it has now been established from these submissions and attached documents that the weights of the plates on the packing list, and which weights were marked on the plates and were relied on during the testing at Constantza, were correct and accurate. Furthermore, as set out in paragraph 16.5 above, none of the bundles of cargo which were destined for the Alexia M exceeded 15 tonnes.

25.1    Owners have confused which plates needed to be re-bundled. As explained above, the 75% of plates weighing less than 5 tonnes could and should have been loaded in bundles of 3, but could not be following the problems with the cranes, and the Master's imposed restriction on loading. The 18% of plates weighing over 5 tonnes and less than 7 tonnes could have been loaded in bundles of 2, but, with the Master's restriction could only be loaded singly. The remaining 6.5% of plates weighing over 7 tonnes and up to 11 tonnes, were to be loaded individually, as per the Charterers' instructions that Owners have already referred to. Had it not been for the problems with the cranes and the Master's restriction on loading there would have been no need to unbundled the plates and load them in lesser quantities.

26.     Owners deny the expected loading rate set out in Paragraph 9 of the Charterers' Defence. They deny this because it suits their case. We submit that the agent in Constantza has a better idea of expected loading rates in Constantza than the Owners.

26.1    Charterers' agents, Messrs Aries, had advised that the expected loading rate for the ship was 1,400 – 1,500 tonnes per gang per day. For the further reference of the Tribunal we attach hereafter at page 111 a confirmation from the stevedores, Messrs Romtrans (who were appointed by the Shippers, Messrs Mittal) that the expected loading

36

rate was 1,450 – 1,550 tonnes per hold per day. As Romtrans point out, they load *"hundreds of thousands of tones of steel cargoes per year"*, so they should know what loading rates can be achieved.

27.    The single gang used from arrival Saturday night to Monday morning (effectively 1 full working day) did not impact on the claim as presented by Charterers. Indeed this has been taken into account in the calculations. While, as Owners have pointed out, Romtrans confirmed that only 1 gang would be supplied on the Sunday after arrival, Romtrans then went on to confirm that on the Monday (the 2nd full working day) that 4 gangs would be allocated to load the Alexia M (page 81, Charterers D&C Submissions).

28.    The Owners admit that problems were experienced by all the vessel's cranes. They suggest however that such problems arose due to alleged overloading. However, no Protests were made to the Charterers/agents or stevedores about any claimed overloading at Agigea/Constantza, neither have Owners advanced any claims (either at the time, or in this arbitration) for repairs/costs arising from the alleged overloading of the cranes. As has been addressed at length in these Submissions there was no overloading of cranes. 93% of the plates loaded weighed under 6 tonnes and there has never been any suggestion by any party, and certainly not the Master that his cranes were overloaded during the 1st full day of loading at Agigea. (The Master gave his restriction on the 2nd full day of loading).

28.1    We remind the Tribunal that the cranes suffered problems almost from commencement of loading.

28.2    There was no misunderstanding from the Master, the weight check on the Monday – following the problems from commencement of

loading, was made basis plates which all weighed less than 5 tonnes. Even if, which is denied, the 4.967 tonne plates weighed 5.017 tonnes per the Owners unilateral Mumbai tests (the Owners only actually weighed one such set of plates, as paragraph 19 refers above), then the combined weight of 3 such plates and the loading beam would come to 16.009 tonnes, or 0.009 tonnes more than the SWL. So the Owners case, on their own evidence, is that the admitted problems with the cranes arose as a result of an overloading of 0.009 tonnes. Given that the crane is tested to 25% of its capacity such an infinitesimal increase over SWL should, if the cranes were properly maintained, make no problem whatsoever. However the Charterers wish to stress to the Tribunal that the cranes were never overloading at any time. Owners have relied on a unilateral and inconclusive survey. Charterers have referred to the fact the plates subject of the test, per the detailed packing list, and as per the explanation from Mittal, weighed 4.967 tonnes.

28.3     The Owners suggest that it would be strange for a vessel to simultaneously have breakdown to all 4 cranes. The problems were not simultaneous, they occurred throughout loading. Further the Owners overlook the fact that the Master gave his limitation on the 2nd full day of loading (Monday 16th). The stevedores followed the Master's restriction on loading to a maxiumum of 10 tonnes and Owners have not suggested that any alleged overloading took place after the Master's limitation. There are no protests from the Master that more than 2 plates, or more than 10 tonnes were lifted after 16th August. From commencement of loading on Saturday night, through to Monday morning, the day of the Master's restriction, only 1 gang was employed, working at 1 hold (no.3) using 1 ship's crane. The Tribunal should ask itself if only 1 gang and 1 crane were used, prior to the Master's imposed restriction, then why were all 4 cranes suffering

problems throughout loading – including the 3 cranes that had not been used before the Master's restriction?  This was nothing to do with overloading of cranes, but everything to do with cranes that kept breaking down and were incapable of lifting their warranted safe working loads.  Indeed, at Agigea/Constantza the Owners sent no less than 4 technicians to the ship together and spares for the cranes.  Charterers reserve the right to address this issue in more detail following disclosure.

29.    The plates loaded at Agigea were accurately described.

29.1.   Charterers do not need to adduce evidence to show that the cranes could not load 2 plates of 4.967 tonnes or 5.947 tonnes individually.  The Charterers case is that following the Master's restriction on Monday 16th April, the stevedores could not load 3 plates of 4.962 tonnes (which would be within the SWL with the 0.958 loading beam) and could not load 2 plates of 5.947 tonnes (which again would have been safely under the SWL), or 2 plates of less than 7 tonnes.  The stevedores complied with the Master's request, and protested at the increased time involved as a consequence, as evidenced in the exchanges attached to the D&C Submissions.

29.2   No tests conducted, or claimed to have been conducted by the Owners showed that the cranes could lift up to the SWL of 16 tonnes.  On the contrary, the Master's claimed tests that Owners have referred to, show that the cranes could not lift the SWL of 16 tonnes.

30.    As set out above, the agents at Constantza are expected to know the expected loading rates of cargoes for their port.  Further, the stevedores have also confirmed the loading rates referred to by the agent, as set out in paragraph 26 above.

31.     There was no "incorrect bundling" of the cargo as Owners suggest. There was no misstatement of the plate weights.

32.     The Break Bulk Survey was based on the manufacturers weight as clearly marked on each sheet.   These weights have already been addressed extensively in these submissions.

33.     No comment.

34      By reference to clauses of the charterparty, paragraph 22 of the D&C Submissions set out why the Master's letter (page 93 of the D&C and Annex C to the Owners' Reply) was itself a breach of the charter.

34.1    At paragraphs 23 and 24 of the D&C by reference to contemporary correspondence it is explained how on 4th May, the Charterers submitted the first draft bills of lading to Owners for their approval.

34.2    At paragraph 34 of the D&C,  the contents of these paragraphs of the D&C are summarily rejected without any evidence to support that rejection.

35.     Paragraph 35 of the D&C Submissions deals with the stoppages as reported by the Master and as actually recorded in the log books provided by the Owners.   Just one of these stoppages has been extrapolated from the revolutions recorded in the engine log book. We see that Owners now deny entirely the contents of paragraph 25, despite the information for all the stoppages having been produced by the Owners/their crew.

36.     As regards the unauthorized call at Aden the Owners state "*It is important for the Tribunal to note that Claimants have always disclosed the vessel's call in Aden to the Respondents*". As we have explained to the Tribunal in Paragraph 20.2 above it was only after the vessel called at Aden and only after Cosmotrade found out, that Owners' admitted to their deviation. Neither the Master nor the Owners advised Charterers at the time. The engine log records no stoppages at Aden (it records that the ship was steaming throughout) and the deck log records the ship steaming at sea (whilst in reality she was in port). We submit that this is sufficiently evident that Owners intended to deceive the Charterers that the ship was at sea, earning hire, when in fact she was in port, off-hire.

36.1    The Owners suggest that the ship needed freshwater (only). The Master also reported "*engine trouble*" to the harbour Master. The issue concerning the fresh water has been dealt with above. There should have been no need to take fresh water, particularly such a large quantity en route. There was clearly a problem with the ship, the Master has declared so to the Aden Harbour Master. Charterers will address this issue in more detail following disclosure from Owners.

37.     The cranes were not overloaded as has been extensively addressed in these Submissions. The methodology applied to the claims as referred to in paragraph 28, and which Owners say they have not understood was the methodology which Charterers advanced in May 2007 with their hire statement at that time. The Charterers position has since been crystallized and their claims have been explained in detail not in paragraph 28, but rather in paragraphs 43-47 of the Defence. The underlying claim that is based in damages and the right to equitable set off however remains the same.

41

37.1    Charterers, did not overloaded the cranes, and have committed no breaches of charter.  The unit weights of the plates – as relied upon from the packing lists, were not misstated.  It is not admitted that the total cargo loaded (being pipes, steel plates, steel sheets, and machinery) exceeded the packing list or bill of lading weight by 1,200 tonnes.

37.2    The $ 70,000 deduction for what at the time was perceived by the Charterers to be a shortloading claim, was accepted by Charterers not to be such a claim, and was accordingly reimbursed.  This issue is dead.

38      At paragraph 38 of the Owners' Reply, the agreement to change destination from Kandla to Sikka, is summarily denied, notwithstanding that the documents evidencing such agreement have been particularized at paragraph 29 of the D&C Submissions.  No evidence is offered to support the denial.  Instead, the unsupported accusations of fraud are repeated by Owners, without any evidence to substantiate them, culminating in the conclusion that any losses or difficulties suffered by the Charterers were caused by Charterers, themselves.  Again no evidence is offered to support this.

38.1    There is a reference in paragraph 38 that the alleged actions of the Charterers would expose the Owners to avoidance of their various insurance covers (no particulars or evidence is offered).  This suggestion was first made on 24th May as referred to in Annex A of Owners' reply Submissions.  As Charterers pointed out in correspondence, the Owners had already prejudiced their P & I insurance cover by making the secret deviation to Aden.  The supposed prejudice is an illusion.

42

38.2　From　12th May onwards, the vessel ceased to communicate with Charterers, and neither they nor their routing service were able to communicate with the vessel. This is described in the Owners' Reply as being "irrelevant". It is plainly relevant. It appears there was nothing wrong with the vessel's systems. They were simply disconnected or switched off. There can be little doubt that the decision to do this was intended to add pressure on Charterers to agree to the Owners' terms.

39.　The agreement by Charterers on 19th May to make a part payment, and to deposit a sum in escrow should have worked to defuse the disputes which had arisen at the loading port. It should have been possible for the parties to complete the charter without further argument or dispute. But by now the Owners were aware that Charterers knew of the Aden call they had striven to keep secret. Charterers had told Owners they knew of the call at the meeting on 17th May.

40.　The Charterers repeat the facts set out in paragraphs 32 to 37 of the D&C Submissions.

40.1　Document No.1 of Annex B of Owners' Reply Submissions, the draft deed of indemnity, waiver and agreement, is the key to understanding why the Owners refused to proceed. It is the key to understanding the whole basis of the non-crane related disputes submitted to this arbitration.

41.　After refusing to perform their charter party obligations for 14 days, the Owners finally capitulated, agreed to a watered down indemnity, and proceeded to discharge cargo at Sikka. This surrender was made even though, according to them (see paragraph 8 of the Owners' Reply) the bills of lading they had been shown for Sikka and the bills against which they decided to discharge cargo at Mumbai were all

43

*"patently fraudulent"* (no evidence is cited to support this statement) and it was *"patently obvious"* to them that another set of *"real clean bills of lading remained in circulation"* (no evidence is cited to support this statement).

41.1    The statement of Charterers' and Shippers' motives in agreeing to the reduced deed of agreement is pure unsupported surmise.

42.    No comment.

43.    The Owners seek to dismiss the continuing problems with the cranes (which were still incapable of lifting 16 tonnes and which continued to break down), as being *"of a minor nature"*, or *"de minimus"*.

43.1    The continuing crane problems were not as a result of any alleged overloading as has been addressed extensively in these submissions.

43.2    Yet again, the Owners claim, totally incorrectly, that Charerers *"refused to attend the weighing of the steel plates"* in Mumbai. The documents attached to the Owners' submissions and referred to in paragraph 18 above show that the reverse is true and that it was the Owners, despite requests from Charterers, who denied Charterers access to the survey and/or the opportunity to make tests. The Owners have attached the Mumbai Statement of Facts to their Submissions, but have omitted 9 further pages which were attached to the SOF, and which attachments are referred to in the SOF. For the guidance of the Tribunal, the pages which Owners have chosen not to show can be seen at pages 190-198 of the Charterers' D&C. The Tribunal will see that Charterers attended the ship twice for testing but were refused by the Owners/Master.

44

44.    No comment.

45.    The Charterers case has been sufficiently pleaded and the basis for the claims has been particularized.

45.1    Paragraph 44 sets out the basis for Charterers claim, which, as stated clearly in that paragraph is a claim in damages. As also stated, it is a claim resulting from breaches of the clauses referred to in Paragraph 5 of the D&C, namely breaches of lines 21, clause 1, clause 22, and the description clause. The deficient condition of the cranes, and which breach was referred to in paragraph 45 of the D&C, and their inability to lift to the warranted 16t SWL have been evidenced in the Break Bulk Survey report, in the Statements of Facts, and in the various protests by the stevedores at both the load port and the discharge ports. All these documents have been attached to the D&C Submissions.

45.2    Paragraph 46 of the D&C advances further/or alternatively an off-hire claim under clause 15 of the charterparty.

45.3    Paragraph 47 of the D&C advances further and/or alternatively an off-hire claim under clause 101.

46.    Paragraphs 45-47 are not repetitive they are as set out in 45.2 and 45.3 above further or alternative claims.

46.1    Paragraphs 50 and 51 of the D&C deal with the problems of discharging at Mumbai.

46.2    The balance of Owners claims and the basis for same, with reference to charterparty clauses is set down in paragraphs 52-55, which are not repetitive.

47.     Charterers maintain that the expenses incurred arose as a result of Owners own breaches, not Charerers.     The cranes were not overloaded.

48.     Even if the Owners' suspicions regarding the bills of lading had been justified by evidence, which they were not, the remedy resorted to by Owners was not a remedy to which they were entitled.  They were not entitled to suspend performance of their obligations under the time charter.  They were not entitled to withdraw services. They were not entitled to refuse delivery of cargo.  Faced with what they mistakenly thought to be breaches of charter committed by the Charterer, the Owners chose themselves to commit breaches of charter.  Owners must now face up to the consequences of what they chose to do.

48.1    The reality of the situation was this. Owners decided to hold the cargo to ransom, the price for its delivery being a complete waiver from Charterers, Shippers and Receivers of any and all claims, plus undertakings not to take any legal issue with Owners' actions up to that date, including their refusal to proceed.  This is what the evidence shows to have been the situation.   The attempt failed.

49.     Charterers maintain their claim for $446,950.05 alternatively $553,748.30 as set down in paragraph 60 of their  D&C, plus interest and costs.

49.1    In view of the allegations of fraud which have been leveled against them, the Charterers seek their costs on an indemnity basis.

46

Yours faithfully,

Transport Counsellors International Ltd

cc:      Reed Smith Richards Butler

            Beaufort House,

            15 St Botolph Street,

            London EC3A 7EE